**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Jerry D. SMITH, Defendant–Appellant.**

**No. 90–30060.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 4, 1991.

Decided Sept. 17, 1991.

David S. Marshall, Prince, Kelley, Newsham & Marshall, Seattle, Wash., for defendant-appellant.

John C. Carver, Asst. U.S. Atty., Seattle, Wash., for plaintiff-appellee.

Marc A. Boman, Perkins Coie, Seattle, Wash., for amicus curiae Federal Deposition Ins. Corp.

Before WALLACE, Chief Judge, O'SCANNLAIN, Circuit Judge, and BURNS,* District Judge.

WALLACE, Chief Judge:

Smith was convicted on numerous counts of conspiracy and bank fraud as a result of his criminal dealings with the Queen City Savings & Loan (Savings & Loan). The district court sentenced Smith to ten years in prison and ordered him to make restitution to the Federal Savings and Loan Insurance Corporation (FSLIC) in the amount of $12,792,160. Smith challenges only the restitution order in this appeal. The district court had jurisdiction pursuant to 18 U.S.C. §§ 3663 and 3664. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291. We affirm in part, reverse in part, vacate the order, and remand.

I

Savings & Loan was a state-chartered institution located in Seattle, Washington, the accounts of which were insured by the FSLIC, predecessor in interest to amicus FDIC. By March 1982, Savings & Loan was in serious financial trouble as a result of a number of bad loans. Smith presented himself as a potential purchaser of the institution.

At the height of his career in the late 1970's, Smith had accumulated a net worth of between $50 million and $90 million, and held substantial ownership interests in financial institutions throughout the Pacific Northwest. In 1980, however, Smith's fortunes worsened as his mortgage company in Eastern Washington collapsed. This loss left him in substantial debt, and his plans for a recovery included gaining control of Savings & Loan. Smith did not have the financial resources to purchase the institution himself. Instead, he convinced Block, a wealthy Canadian client, to make a tender offer for the stock of Savings & Loan. A majority of the shareholders accepted the offer, and Block pur-

chased about 93 percent of the institution's stock. Federal regulators approved the purchase in the fall of 1982.

Although he did not own any of Savings & Loan's stock himself, Smith fostered the impression that he was the true purchaser of a controlling percentage of the stock. For example, between the time of Block's tender offer and the point at which Block took control, Smith attended numerous board meetings of Savings & Loan and gave direction on how to solve the institution's financial problems. In addition, on many occasions Smith led various Savings & Loan officials and patrons to believe that he was the actual purchaser of the institution's stock. Thus, although he held no official position at Savings & Loan and did not own a single share of stock, Smith was able to cultivate an image as a Savings & Loan insider that allowed him to influence the institution's financial decisions.

Thus, between 1982 and 1983, Smith persuaded Savings & Loan to extend five separate high risk loans to shell corporations controlled by him. Three of these transactions were land acquisition and development loans, while the remaining two were joint ventures in land purchase and development. Each of the five loans was secured by speculative real estate in the Midland–Odessa area of west Texas, the appraisal value of which was largely inflated by Smith for loan application purposes. The balance sheets and cash-flow projections for the borrowing corporations were most often fraudulent. Moreover, most of the loan proceeds, which were in each case designated for the development of the collateral property, were diverted to the personal control of Smith. Smith used these funds to pay his previous creditors and to finance other outside projects.

Predictably, all five loans fell into default, and the resulting losses pushed Savings & Loan into failure. In July 1984, Gibraltar Saving of California (Gibraltar) acquired Savings & Loan. Almost all of Savings & Loan's assets and liabilities were

* Honorable James M. Burns, United States District Judge, District of Oregon, sitting by desig-

nation.

transferred to Gibraltar, and Gibraltar received a large payment of assistance from FSLIC. After this transfer, the sole remaining asset of Savings & Loan was the institution's claims against its former directors, officers, Smith and others. This asset was assigned to FSLIC during the transition period.

In 1987, the government indicted Smith and three others on sixteen counts of conspiracy, fraud, and bank fraud. A jury convicted Smith on 15 of the counts, and we affirmed the conviction and prison sentence. *United States v. Smith*, 891 F.2d 703 (9th Cir.1989), *amended*, 906 F.2d 385 (9th Cir.), *cert. denied*, — U.S. ——, 111 S.Ct. 47, 112 L.Ed.2d 23 (1990). After numerous delays and two hearings, the district court arrived at the restitution figure and ordered Smith to pay it to FSLIC within five years of his release from prison.

## II

■ Smith first challenges the restitution order on the ground that it constitutes an impermissible application of the Victim and Witness Protection Act (Act), 18 U.S.C. §§ 3663–3664.[1] We review the legality of a sentence de novo. *United States v. Angelica*, 859 F.2d 1390, 1392 (9th Cir.1988) (*Angelica*).

### A.

Smith alleges that many of the criminal acts and resultant losses occurred prior to January 1, 1983, the effective date of the Act. *See id.* at 1393. Because the restitution order is based on an amount of damages that includes losses incurred prior to the effective date, Smith contends that it is invalid.

We confronted this argument in *Angelica*, and concluded that the Act did apply to all losses resulting from a mail and wire fraud scheme that had begun before, and continued beyond, January 1, 1983. Because the scheme involved in *Angelica* was "similar to the ongoing offense of conspir-

acy," we refused to narrow the restitution order to encompass only losses incurred after the effective date. *Id.* Instead, "we look[ed] to the duration of the entire fraudulent scheme," and concluded that all of the victims' losses were subject to the restitution order. *Id.* *Angelica* controls this case. Smith was convicted of an ongoing criminal conspiracy, embracing all five loan transactions, that continued well beyond January 1, 1983. Thus, as in *Angelica*, the district court was correct in applying the Act to all losses resulting from the scheme.

Alternatively, Smith argues that we should reconsider *Angelica* in light of the Supreme Court's recent holding in *Hughey v. United States*, 495 U.S. 411, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990). *Hughey* is not on point. It merely holds that the Act authorizes restitution only for those losses caused by the offense of conviction, and not for losses resulting from other alleged conduct. *Id.* 110 S.Ct. at 1981. The entire restitution order in this case relates to losses arising from acts for which Smith was convicted, and thus satisfies *Hughey*. *Hughey* does not deal with the question of whether the restitution order may encompass losses incurred before January 1, 1983, and therefore does not impact on our holding in *Angelica*.

### B.

■ Smith next contends that the district court erred in concluding that FSLIC was a "victim" which can receive restitution under the Act. 18 U.S.C. § 3663(a)(1). Because Savings & Loan, not FSLIC, was the entity that suffered the losses, Smith argues that FSLIC is unauthorized to receive payment. We have previously held, however, that a governmental entity is eligible to receive restitution as a "victim" under the Act. *United States v. Ruffen*, 780 F.2d 1493, 1496 (9th Cir.) (*Ruffen*), *cert. denied*, 479 U.S. 963, 107 S.Ct. 462, 93 L.Ed.2d 407 (1986). Although it was not directly harmed, FSLIC did suffer as a result of Smith's conduct, and the Act's

---

**1.** Congress has recently amended the relevant provisions of the Act. *See* Crime Control Act of 1990, Pub.L. No. 101–647, § 2509, 104 Stat. 4789, 4863 (1990). We express no opinion on how these amendments will affect future sentencing decisions.

legislative history makes it clear that the statute is intended to encompass both direct and indirect victims of criminal acts. *See* S.Rep. No. 532, 97th Cong., 2d Sess. 13, *reprinted in* 1982 U.S.Code Cong. & Admin.News 2515, 2519; *see also United States v. Hairston*, 888 F.2d 1349, 1354–55 (11th Cir.1989) (describing legislative history). The Fifth Circuit has twice held that FSLIC may receive restitution under the Act when, as in this case, it has acquired the claims of a defunct savings and loan. *See United States v. Rochester*, 898 F.2d 971, 980 n. 7 (5th Cir.1990) *(Rochester); United States v. Ryan*, 874 F.2d 1052, 1053 (5th Cir.1989) *(Ryan )*. These rulings are persuasive, and we conclude that FSLIC qualifies as a "victim" under the Act.

## III

■ We deal next with Smith's argument that the restitution order violates his right to due process under the fifth amendment to the Constitution. We review de novo his claim that the sentence is constitutionally invalid. *See United States v. Ahumada–Avalos*, 875 F.2d 681, 684 (9th Cir.), *cert. denied*, 493 U.S. 837, 110 S.Ct. 118, 107 L.Ed.2d 79 (1989).

■ In analyzing the due process claim, "we consider the private and governmental interests at stake, the risk of an erroneous deprivation of the private interests through existing procedures, and the probable value of additional or substitute procedures." *United States v. Keith*, 754 F.2d 1388, 1392 (9th Cir.) *(Keith), cert. denied*, 474 U.S. 829, 106 S.Ct. 93, 88 L.Ed.2d 76 (1985). In essence, Smith argues that due process was violated because the criminal restitution process denied him some of the procedures that the alternative civil litigation process would have provided him. For example, Smith alleges that the availability of civil discovery procedures would have allowed the court to explore more fully the causes and extent of the economic losses in this case.

We confronted an identical due process argument in *Keith*, and concluded that "due process is satisfied by affording the defendant an adequate opportunity to present his objections." *Id.* at 1392. We thus upheld a restitution order under the Act, even though the district court had declined to hold a special restitution hearing. *Id.* Smith correctly observes that the claims involved in *Keith* were not as complex as the claims involved in this case. The district judge recognized this, however, and in response held two lengthy restitution hearings to gather the relevant data, despite the fact that the Act "does not require an oral hearing in order for the court to determine whether restitution should be awarded and the amount thereof." *Rochester*, 898 F.2d at 981. At these restitution hearings, the district court analyzed both whether Smith should be subject to a restitution order and whether it should encompass the losses as asserted by the government. Smith presented a great deal of evidence on both issues. Moreover, Smith actually benefited because the restitution hearings were part of the criminal process. Court-appointed counsel represented him, and public funds enabled him to hire appraisal experts for both hearings. We therefore conclude that, although this was a complicated case, the procedures used in entering the restitution order were constitutionally sufficient.

■ In a related argument, Smith contends that the district court violated the Act in issuing the restitution order because of the extreme complexity of the case. The relevant portion of the Act provides that "[t]o the extent that the court determines that the complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution under this section outweighs the need to provide restitution to any victims, the court may decline to make such an order." 18 U.S.C. § 3663(d). Despite Smith's pleas to the contrary, this provision contains no mandatory command. It merely gives the district court discretion to forego entering a restitution order if it would entail undue delay and complexity. The district court in this case obviously concluded that the need to provide restitution to FSLIC outweighed the resultant prolongation of the sentenc-

ing process, and we conclude that the court did not abuse its discretion.

## IV

■ Smith next argues that the district court erred in finding, as part of its restitution order, that he will have the ability to pay nearly $12.8 million to FSLIC within five years of his release from prison. We review a sentence that is within the statutory limits of the Act for abuse of discretion. *Angelica*, 859 F.2d at 1392. Findings of fact upon which a sentence is based are reviewed under the clearly erroneous standard. *United States v. Burns*, 894 F.2d 334, 336 (9th Cir.1990).

■ Although Smith had a net worth of between $50 million and $90 million in the late 1970's, at the time of sentencing Smith had few assets, numerous liabilities, and a monthly income of $5,000. Smith argues that it will be impossible for him to accumulate enough wealth to pay the nearly $12.8 million due FSLIC within five years of release from prison, especially because he will be a convicted felon. He therefore contends that the district court abused its discretion in setting such a high award.

We have expressly held that "[t]he Act does not prohibit a sentencing court from imposing a restitutionary sentence upon a defendant who is indigent at the time of sentencing." *Keith*, 754 F.2d at 1393; *see also Ryan*, 874 F.2d at 1054 (allowing restitution order against insolvent defendant under the Act because "a defendant's financial situation may well change in the future, making him able to pay some if not all the restitution ordered"). Although the restitution order against Smith is not prohibited on the grounds that he is insolvent, the Act does impose important substantive and procedural limitations on the trial judge's discretion to issue such an order. Most relevant to this case, the Act provides that in determining whether to order restitution the district court "shall consider the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such

other factors as the court deems appropriate." 18 U.S.C. § 3664(a).

■ Thus, if a district court fails to consider a defendant's ability to pay, the court abuses the discretion afforded it by the Act. *See United States v. Mahoney*, 859 F.2d 47, 51 (7th Cir.1988) (the district judge "simply forgot or disregarded the defendant's ability to pay," requiring the order of restitution to be vacated). In ordering that Smith make restitution, the district court expressly "consider[ed] the financial resources of [Smith], and the financial needs and earning ability of [Smith] and his dependents," and found that although Smith "may not currently possess significant assets, he has demonstrated the ability to accumulate assets in the amount of this restitution order within five years from his release from custody." The court therefore satisfied the requirements of the Act.

Smith argues that the district judge improperly neglected to make necessary findings of fact on the amount of the award. In so arguing, he misconstrues circuit precedent interpreting the Act. Although some circuit courts "have invoked their supervisory power to require district courts to make specific fact findings on those matters relevant to application of the [Act]," *e.g.*, *United States v. Bruchey*, 810 F.2d 456, 458 (4th Cir.1987), we have refused to do so. We have stated that "[t]here is no textual support for [the] contention that the district court must make findings of fact concerning [defendant's] financial condition before imposing restitution." *United States v. Cannizzaro*, 871 F.2d 809, 810 (9th Cir.), *cert. denied*, 493 U.S. 895, 110 S.Ct. 245, 107 L.Ed.2d 195 (1989). Because the Act only requires that the district court "consider" the listed factors, the record need only "reflect that the district judge had at his disposal information bearing on the considerations enumerated in section 3664." *Id.* at 811. As in *Cannizzaro*, Smith's presentence report set forth information concerning his financial condition and earning capacity. The district court had evidence of Smith's unconventional financial abilities, as well as

the numerous wealthy contacts that he has maintained. In addition, Smith himself stated to the court that he has "good earning power right now," and could get a job immediately for as much as $10,000 a month. Because the district court had at its disposal all the relevant information, it did not abuse its discretion under the Act.

 Smith contends that the district court clearly erred in finding that he will be able to pay the amount ordered within five years of his release from prison. One can reasonably argue that it will be very difficult for Smith to pay the entire amount within five years of his release, even assuming a persistent and good faith effort to do so. This is not determinative, however. *Bearden v. Georgia*, 461 U.S. 660, 672, 103 S.Ct. 2064, 2072, 76 L.Ed.2d 221 (1983), "requires that incarceration of an offender for noncompliance with a restitution order be preceded by a determination that the offender has not made sufficient bona fide efforts to pay, or, if the offender has made such efforts, that alternative punishments will not satisfy the penological interests of the government." *Keith,*

754 F.2d at 1391. We have held that this protection applies to restitution orders issued under the Act. *Id.* Thus, if Smith has not paid the full amount at the end of the five-year period but can demonstrate that he has made a diligent, good faith effort to do so, he may petition the district court at that time for either an extension of time period for payment or a remittitur. *See Ruffen*, 780 F.2d at 1495.[2]

V

Smith finally argues that the amount of the restitution order was improperly calculated, and challenges both the amount of credit given him for the value of the collateral property securing the five loans and the prejudgment interest included in the restitution award. The first challenge is tested for an abuse of discretion while the latter is governed by an interpretation of the Act, and we therefore review it de novo. *See Angelica*, 859 F.2d at 1392.

A.

 In calculating the restitution to be paid by Smith, the district court first deter-

---

**2.** We disagree with the dissent's argument that our approval of the restitution award ignores the fact that restitution "is a criminal, not a civil penalty." We have previously pointed out that criminal restitution is "a means of achieving penal objectives such as deterrence, rehabilitation, or retribution." *United States v. Cloud*, 872 F.2d 846, 854 (9th Cir.), *cert. denied*, 493 U.S. 1002, 110 S.Ct. 561, 107 L.Ed.2d 556 (1989). The award in this case is consistent with all of these goals. Requiring Smith to attempt diligently to pay back the fraudulently acquired funds could have a rehabilitative effect. *Cf. United States v. Terrigno*, 838 F.2d 371, 374 (9th Cir.1988) (pointing out "our uncertainty about how rehabilitation is accomplished" and stating that probation order that prevents individual from profiting from the crime may serve as an important reminder that "crime does not pay" (internal quotations omitted)). Similarly, a large restitution award "adds to the deterrent effect of imprisonment" and "vindicat[es] society's interest in peaceful retribution." *United States v. Brown*, 744 F.2d 905, 909 (2d Cir.), *cert. denied*, 469 U.S. 1089, 105 S.Ct. 599, 83 L.Ed.2d 708 (1984). Therefore, the restitution award is compatible with the goals of the criminal justice system.

It was also legitimate for the district court to consider the goal of compensation when ordering restitution. At least two other circuits have

emphasized the compensatory nature of a restitution award under the Act. The Fifth Circuit has stated that "[t]he restitution imposed pursuant to the [Act] ... is not in the nature of a fine. Rather the purpose of the [Act] is to ensure that wrongdoers, to the degree possible, make their victims whole." *Rochester*, 898 F.2d at 983 (internal quotations omitted). Similarly, the Second Circuit has expressly held that a district court may order full restitution, despite the defendant's indigency at the time of sentencing. *United States v. Atkinson*, 788 F.2d 900, 904 (2d Cir.1986). In so holding, the court stated that:

> Since many defendants who are sentenced to terms of incarceration do not have the funds to make restitution immediately, restitution orders would be severely limited if district judges did not have discretion to discount the importance of present indigency in performing the statutory balance. Although there may be little chance that it will ever be made, if full restitution is not ordered at the time of sentencing, an indigent defendant would evade the statutory purpose of making the victim whole in the event that he should come into sufficient funds.

*Id.* By this reasoning, the district judge in this case should not be reversed for imposing a restitution award that would fully compensate the victim.

mined that the unpaid balance due on the five fraudulent loans provided a measure of the total loss suffered by FSLIC as a victim. Because the Act forbids restitution "with respect to a loss for which the victim has received or is to receive compensation," 18 U.S.C. § 3663(e)(1), the court reduced this initial loss figure in two respects. First, it recognized that FSLIC had recovered substantial amounts against its loss as a result of civil litigation, and therefore deducted those amounts from the total loss figure. Next, the court acknowledged that the victims of Smith's illegal conduct had received partial compensation for their losses through the seizure of the collateral property that had secured his five fraudulent loans. At the time of sentencing, some of the property that had served as collateral had been sold, but Gibraltar retained ownership over a substantial portion. Therefore, the court deducted (1) the amount realized from the disposition of collateral properties, or the fair market value of those properties at the time of the disposition, if higher; and (2) the fair market value of the unsold collateral on the date of the restitution order.

Smith contends that the district court failed to give him adequate credit against the restitution amount for the value of the collateral property. He argues that the district court should have measured the value of the property at an earlier date than it did: the date Savings & Loan or Gibraltar "took control" of it, rather than at the time of sale or sentencing. He alleges that because the value of Texas real estate steadily declined throughout the time in question, the measurement of the property's value at the later dates resulted in an inadequate credit for the collateral property, and that therefore the restitution figure is far too high.

We agree with Smith that the district court used incorrect dates in valuing the property. The Act provides that if a victim has suffered a loss of property, the district court may order restitution in the amount of this loss "less the value (*as of the date the property is returned*) of any part of the property that is returned." 18 U.S.C. § 3663(b)(1)(B) (emphasis added). We in-

terpreted this portion of the Act in *United States v. Tyler*, 767 F.2d 1350 (9th Cir. 1985) (*Tyler*), in which Tyler pled guilty to theft of timber and was ordered to pay restitution under the Act. The district court determined the amount of restitution as the difference between the value of the timber at the time of sentencing and the higher value at the time of theft. *Id.* at 1351. Because the government recovered the timber on the day of the theft, however, we concluded that "[a]ny reduction in its value stems from the government's decision to hold the timber during a period of declining prices, not from Tyler's criminal acts." *Id.* at 1352. The value of the property " 'as of the date the property [was] returned' " equaled the amount lost when the timber was stolen, and therefore restitution under the Act was inappropriate. *Id.* (quoting 18 U.S.C. § 3579, which was subsequently renumbered as 18 U.S.C. § 3663).

The same reasoning should apply in determining the value of the collateral property in this case. Smith should receive credit against the restitution amount for the value of the collateral property as of the date title to the property was transferred to either Savings & Loan or Gibraltar. As of that date, the new owner had the power to dispose of the property and receive compensation. *Cf.* 18 U.S.C. § 3663(e)(1) (restitution may be ordered for any person who has compensated a victim). Value should therefore be measured by what the financial institution would have received in a sale as of that date. Any reduction in value after Smith lost title to the property stems from a decision by the new owners to hold on to the property; to make Smith pay restitution for that business loss is improper. *See Tyler*, 767 F.2d at 1352. The victims in this case "receive[d] compensation" when they received title to the property and the corresponding ability to sell it for cash; the value of the compensation should therefore be measured and deducted from the total loss figure as of the date title was transferred. 18 U.S.C. § 3663(e)(1). Because the law is

clear, to do otherwise would be an abuse of discretion.

It may be that the court corrected this error by increasing the collateral property valuation figure from $2.895 million to $5 million before setting the restitution figure. Unless the value of the various properties when title was transferred totals more than $5 million, any recalculation on remand will not result in a lower restitution figure. Thus, the district court's valuation timing error may be harmless. From the record before us, however, we cannot tell whether a correct valuation of the collateral property will result in a credit to Smith of more or less than $5 million. We therefore vacate and remand to the district court for a new determination of the value of collateral property.

B.

■ Smith also contends that the district court erred by including prejudgment interest in the restitution award. There is no language in the Act that specifically allows or forbids prejudgment interest. The Supreme Court has held that such silence need not be interpreted "as manifesting an unequivocal congressional purpose that the obligation shall not bear interest." *Rodgers v. United States*, 332 U.S. 371, 373, 68 S.Ct. 5, 7, 92 L.Ed. 3 (1947). Instead, the question of whether interest should be imposed on particular statutory obligations should be governed "by an appraisal of the congressional purpose in imposing them and in the light of general principles deemed relevant by the Court." *Id.*

When confronted recently with an identical argument, the Fifth Circuit ruled that it was proper to include prejudgment interest in a restitution award under the Act in order to fully compensate victims for their losses. *Rochester*, 898 F.2d at 982–83. We agree with this analysis. We have repeatedly held that the Act authorizes restitution for a victim's "actual losses." *E.g.*, *United States v. Cloud*, 872 F.2d 846, 855 (9th Cir.), *cert. denied*, 493 U.S. 1002, 110 S.Ct. 561, 107 L.Ed.2d 556 (1989). Foregone interest is one aspect of the victim's actual loss, and thus may be part of the victim's compensation. *See Rochester*, 898 F.2d at 983.

■ The amount of prejudgment interest awarded may change on remand, as a result of the revaluation of the collateral property and possible reduction of the figure on which the interest is based. If not, the restitution order may stand. The court did not use the interest rates specified in the fraudulent loans to calculate the prejudgment interest, a procedure that would have allowed FSLIC to recover lost profits. Instead, the court used a much lower governmental loan rate, in order simply to compensate the victim for the loss of funds that were illegally taken. No objection to the rate of interest used by the district court is before us, and the adequacy of that interest rate is therefore not subject to review.

VI

We therefore affirm the district court in all respects except for its valuation of the property used as collateral in the fraudulent transactions. We vacate the restitution award and remand to the district court for the calculation of a restitution award that incorporates a credit for the proper value of collateral received in partial payment on the defaulted loans, plus prejudgment interest.

AFFIRMED IN PART, REVERSED IN PART, AND VACATED AND REMANDED.

O'SCANNLAIN, Circuit Judge, concurring in part and dissenting in part:

I concur wholeheartedly in the judgment and in all but two Parts of the majority's opinion. I dissent, however, from Parts IV and V–A.

In Part IV, the majority holds that the district court adequately considered Smith's ability to pay before it found, as a factual matter, that he will be able to produce one of the largest restitution awards ever imposed in this circuit—nearly $12.8 million—within five years of his release from prison. Because I do not believe that

the record supports either the majority's holding or the district court's finding, I would reverse the district court on this ground.[1]

In Part V–A, the majority holds that the district court under-valued the collateral held by Smith's institutional victims when it calculated the total loss attributable to his criminal conduct. The majority thus concludes that the court overstated the amount properly compensable by restitution to this extent. Because I believe that the majority mischaracterizes the nature of the victims' loss and because I believe that the district court's valuation of the collateral was proper, I would affirm the district court on this ground.

## I

## A

The Victim and Witness Protection Act of 1982 ("VWPA") provides that:

The court, in determining whether to order restitution under section [3663] of this title and the amount of such restitution, *shall consider* the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate.

18 U.S.C. § 3664(a) (1988) (emphasis added). In determining whether district courts have satisfied this obligation, at least three of our sister circuits "have invoked their supervisory power to require district courts to make specific factfindings" on the considerations identified in this provision. *United States v. Bruchey*, 810 F.2d 456, 458–59 (4th Cir.1987) (citing *United States v. Hill*, 798 F.2d 402, 406–07 (10th Cir. 1986), and *United States v. Palma*, 760 F.2d 475, 480 (3d Cir.1985)). We, however, have rejected their lead.

In *United States v. Cannizzaro*, 871 F.2d 809 (9th Cir.), *cert. denied*, 493 U.S. 895, 110 S.Ct. 245, 107 L.Ed.2d 195 (1989),

we noted that "[t]here is no textual support for [the] contention that the district court must make findings of fact concerning [the defendant's] financial condition before imposing restitution [under the VWPA]." *Id.* at 810. We explained:

There is a material difference between requiring a district court to make findings of fact and requiring it to consider certain factors. Findings of fact can only be made on the basis of a formal adversarial record; the parties must be permitted to present testimonial and documentary evidence; one party or the other must carry the burden of proof as to each contested issue. For example, where the amount or type of restitution is disputed, the government must demonstrate, by a preponderance of the evidence, the loss sustained by the victim; the defendant carries the burden, again by a preponderance of the evidence, of demonstrating his financial resources (or lack thereof), as well as the financial needs of his dependents. 18 U.S.C. § 3664(d).

On the other hand, requiring the district court to consider certain factors grants the court broad discretion to determine the type and amount of evidence it deems relevant. We have no authority to modify the statutory scheme by narrowing that discretion. "The test is whether the district court complied with the applicable [statute]. If the [statute] do[es] not require a detailed explanation of the court's decision, the district court need not volunteer one...." *United States v. Gomez*, 846 F.2d 557, 560 (9th Cir.1988).

*Id.*

The majority is therefore correct to hold that the district court had no obligation to state on the record the reasons that led it to conclude why $12.8 million was an appropriate sum. *See ante* at 623. The court had an obligation only to *consider* the factors enumerated in the statute, and the court expressly stated that it undertook the

---

1. As appellant's counsel noted during oral argument, we review the district court's findings of fact for clear error and its decision to order

restitution on the basis of those findings for an abuse of discretion.

proper considerations when it announced its decision.

B

The majority's holding on this point, however, only answers half of Smith's argument. Smith has not simply tried to persuade us to adopt the procedural prophylactic—the explicit factfinding requirement—that some of our sister circuits have endorsed; he has also argued that there is inadequate support in the record for the district court's order. On this score, his argument is persuasive. ·

*Cannizzaro* did not and could not hold— as the majority implicitly does here—that a restitution order is essentially unreviewable so long as the district court simply states on the record that it has weighed the appropriate statutory considerations. If the court's order utterly lacks factual support in the record, then a mere conclusory assertion that the court has engaged in the required analysis cannot suffice to uphold the order. Even though the *manner* by which the court reached its result may not be an abuse of discretion, the substantive result *itself* still can be. *See United States v. Angelica,* 859 F.2d 1390, 1392 (9th Cir. 1988) (court still reviews restitution orders that comply with the statutory limits and procedural requirements of the VWPA for an abuse of discretion); *Schmidt v. Herrmann,* 614 F.2d 1221, 1224 (9th Cir.1980) (abuse of discretion standard means that court will reverse where it has " 'a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors' " (citations omitted). Such is the case here.

Indeed, the apparent divergence between the defendant's ability to pay and the amount of the restitution order is more extreme in this case than in any decision cited by either party and than any reported decision of which I am aware—including all the decisions that have *vacated* restitution orders. For example, in *United States v. Mahoney,* 859 F.2d 47 (7th Cir.1988), the Seventh Circuit invalidated an order that had been entered against a defendant who,

like Smith, had been convicted of defrauding financial institutions. The district court had ordered the defendant, who was free on probation, to pay $288,655 over the course of a five-year period despite an annual salary of only $30,000. In reversing, a unanimous court of appeals explained:

the restitution order itself—which requires the defendant to make *full* restitution (totalling over $288,000) over the requisite five-year period of payment— leaves little doubt that the judge simply forgot or disregarded the defendant's ability to pay and the needs of his dependent wife as well. We fail to perceive how this defendant, a man without any tangible assets and a $30,000 annual salary—will somehow be able to repay a debt totalling more than nine times his annual salary in five years.

859 F.2d at 51 (emphasis in original); *see also United States v. Clark,* 901 F.2d 855 (10th Cir.1990) (district court abused its discretion in requiring defendant with negative cash flow to pay over $153,000 in restitution). By comparison, the district court in this case has ordered an *incarcerated* defendant with current liabilities of $10.8 million and an annual cash flow of *negative $183,000* to produce $12.8 million within five years of his release from prison at the age of fifty-eight. To comply with this order, Smith will have to produce a *monthly* income of over $213,000—after taxes and necessary living expenses—in each of the first sixty months after his release from prison. The contrast to the order in *Mahoney* hardly counsels affirmance.

Nor is the *Mahoney* decision only illustrative on a factual level. Like this court in *Cannizzaro,* the *Mahoney* court explicitly rejected the idea that district courts must make specific factfindings on the considerations enumerated in the VWPA. *See Mahoney,* 859 F.2d at 49–50; *see also United States v. Gomer,* 764 F.2d 1221, 1222 (7th Cir.1985). Nonetheless, the court refused to accept at face value the district court's bare assertion that it had properly discharged its statutory obligation; the court recognized its own obligation to look

behind the district court's order to evaluate the sufficiency of the evidence in the record. Because that evidence could in no way support the restitution order, the court reversed.

Here, too, one can only conclude that the district court "simply forgot or disregarded" the evidence that was put before it regarding Smith's ability to pay. *Mahoney*, 859 F.2d at 51. Like the order at issue in *Mahoney*, the order at issue here also requires the defendant to make full restitution, which is at least prima facie evidence of a failure to balance the statute's competing considerations.[2] Even a summary glance at the presentence report, which the government has not challenged, indicates that the order is wholly unrealistic. At the time of sentencing, Smith claimed total assets of only $7,750; liabilities of $10.8 million; a monthly income of $5,000; and monthly expenses of $20,250. He claimed to have thirty-seven personal debts and no remaining corporate ownership interests. His federal tax returns for the three years immediately preceding the court's order, which are also part of the record, demonstrate negative personal income for each of those years as well. In addition, as Smith's counsel has argued, it is clear that Smith will have even less of the youth, credit, and assets necessary to support the court's order when he finally is released from custody at the end of his ten-year term, and at that point, his felony conviction will likely handicap his employment efforts and earning potential even further.

The government has challenged none of this evidence. Nor has it presented any contrary evidence of its own to suggest that Smith may have access to additional assets or funds currently hidden from the court's view. Rather, in its effort to justify the district court's order, the government has simply pointed to two prior decisions by this court that have upheld restitution awards—*United States v. Ruffen*, 780 F.2d 1493 (9th Cir.), *cert. denied*, 479 U.S. 963, 107 S.Ct. 462, 93 L.Ed.2d 407 (1986), and *United States v. Keith*, 754 F.2d 1388 (9th Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 93, 88 L.Ed.2d 76 (1985)—and to Smith's past fortunes, which it claims are strong evidence of his ability to accumulate wealth.

Neither of these arguments, however, is persuasive. First, our decisions in *Ruffen* and *Keith* simply stand for the proposition that the VWPA does not bar sentencing courts from imposing restitution upon defendants who are indigent at the time of sentencing. Neither case denies the fact that the VWPA requires courts to balance competing considerations and to weigh factors relating to the defendant's ability to pay. Indeed, both cases explicitly recognize the Act's affirmative balancing requirement. *See Ruffen*, 780 F.2d at 1495; *Keith*, 754 F.2d at 1393. Second, courts have made clear that evidence of past earnings alone will not suffice to satisfy the Act; the relevant question is whether the defendant's present condition and future prospects, when viewed *at the time of sentencing*, support the inference of an ability to fulfill the court's order. *See, e.g., United States v. Atkinson*, 788 F.2d 900, 903 (2d Cir.1986). It is simply beyond dispute that the conditions which produced Smith's high-flying days in the seventies have irretrievably passed.

C

Nonetheless, the majority refuses to grant—or even to deny—that the overwhelming weight of the evidence leads to the " 'definite and firm conviction that the court below committed a clear error of

---

**2.** *See Bruchey*, 810 F.2d at 458 ("the VWPA implicitly requires the district judge to balance the victim's interest in compensation against the financial resources and circumstances of the defendant—all while remaining faithful to the usual rehabilitative, deterrent, retributive, and restrictive goals of criminal sentencing"); *Mahoney*, 859 F.2d at 49 (quoting *Bruchey* ); *United States v. Peden*, 872 F.2d 1303, 1310 (7th Cir.

1989) (same); *United States v. Atkinson*, 788 F.2d 900, 903 (2d Cir.1986) (VWPA requires "balancing of the victim's loss against the defendant's resources and circumstances"); *cf. United States v. Mitchell*, 893 F.2d 935, 936 (8th Cir. 1990) (order of restitution under Federal Sentencing Guidelines must be based upon "an informed decision" regarding the defendant's ability to pay).

judgment in the conclusion it reached upon a weighing of the relevant factors.'" *Schmidt,* 614 F.2d at 1224 (defining abuse of discretion standard) (citations omitted). Rather, the majority effectively holds that by reciting the magic words—by simply stating that it " 'consider[ed] the financial resources of [Smith], and the financial needs and earning ability of [Smith] and his dependents' "—the district court "satisfied the requirements of the Act." *Ante* at 623 (quoting district court's order). Although acknowledging, as it must, that the prospects for Smith's compliance with the order are not great, the majority discounts this concern by noting that Smith can always petition for an extension of time or seek a "remittitur" when the deadline for final payment approaches. *See ante* at 624.

Under the majority's holding, therefore, a district court in the Ninth Circuit may now order full restitution under the VWPA—even where the evidence before it overwhelmingly indicates that the defendant will not be able to pay—so long as it performs the procedural formality of stating that it has *considered* the defendant's ability to pay. I cannot agree. Courts that elect to impose the criminal penalty that the VWPA authorizes must have an adequate basis in the record for doing so. Where they do not, it is no answer to the claim that they have abused their discretion to suggest that they might later retreat from their orders in subsequent proceedings. Indeed, the prospect of a future retreat from the order we uphold today in no way rebuts the contention that that order lacks support in the record and constitutes an abuse of discretion; if anything, the majority's invocation of that prospect supports Smith's contentions.

In my view, the majority has elected to emphasize one purpose of the VWPA to the detriment of its other, competing purposes. An award under the VWPA, it must be remembered, is a criminal, not a civil penalty. Its primary function is to serve "the traditional purposes of punishment—it can deter potential offenders, serves society's legitimate interest in peaceful retribution, and can be a useful step toward rehabilita-

tion." *United States v. Ciambrone,* 602 F.Supp. 563, 568 (S.D.N.Y.1984). Congress did not intend for the VWPA to serve as a substitute for a civil damages award. *See id.; United States v. Satterfield,* 743 F.2d 827, 836–37 (11th Cir.1984) (referring to the VWPA's legislative history); *United States v. Brown,* 744 F.2d 905, 908–11 (2d Cir.) (same), *cert. denied,* 469 U.S. 1089, 105 S.Ct. 599, 83 L.Ed.2d 708 (1984). As the Seventh Circuit explained in *Mahoney:*

> it is most paramount that the defendant, in the all-important rehabilitative process, have at least a hope of fulfilling and complying with each and every order of the court. Thus, an impossible order of restitution, as made in this case, is nothing but a sham, for the defendant has no chance of complying with the [order], thus defeating any hope of restitution and impeding the rehabilitation process.

*Mahoney,* 859 F.2d at 52.

I therefore dissent from Part IV of the majority's opinion.

## II

As the foregoing indicates, I believe that the district court's $12.8 million figure is impermissibly high in light of the available evidence regarding Smith's ability to pay. Unlike my colleagues, however, I would affirm the district court's order if the evidence did suggest an ability to pay.

The majority reverses because it concludes, in Part V–A, that the district court undervalued the collateral property held by Smith's victims when it attempted to calculate the total loss that they incurred from his fraud. In the majority's view:

> Smith should receive credit against the restitution amount for the value of the collateral property *as of the date title to the property was transferred* to either [Queen City] Savings & Loan or Gibraltar. As of that date, the new owner had the power to dispose of the property and receive compensation.

*Ante* at 625 (emphasis added). I disagree and therefore dissent from Part V–A of the majority's opinion as well.

## A

A restitution order under the VWPA may require that the defendant:

(1) in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense—

(A) return the property to the owner of the property or someone designated by the owner; or

(B) if return of the property under subparagraph (A) is impossible, impractical, or inadequate, pay an amount equal to the greater of—

(i) the value of the property on the date of the damage, loss, or destruction, or

(ii) the value of the property on the date of sentencing, less the value (as of the date the property is returned) of any part of the property that is returned. . . .

18 U.S.C. § 3663(b)(1) (1988).[3]

Smith's argument, which the majority accepts, is that the district court failed to give adequate credit under this provision for the value of the real estate that secured his five fraudulent loans. *See ante* at 625. It is no secret that the value of West Texas real estate steadily declined during the 1980's, and Smith essentially contends that the court calculated the restitutionary value of the collateral properties at an unfairly late date during the course of that decline. The result, Smith implies, is that the restitution order improperly ascribes to his illegal conduct losses that are actually attributable to market forces. In Smith's view, the appropriate setoff date for each of the five respective properties is the date on which Queen City "took control" of that particular property upon foreclosure.

To assess the validity of Smith's argument, however, one must first understand precisely what loss the court's restitution order is meant to restore. In this case, the "stolen property" was capital—loan proceeds that were fraudulently procured and interest payments that were fraudulently denied. Because Smith cannot return the actual loan proceeds that he fraudulently took and because the value of capital increases with time, it follows that Smith's victims are entitled to an award of restitution under subsection 3663(b)(1)(B)(ii). In other words, they are entitled to the present value of the stolen capital: whatever amount of money Queen City would have had *on the date of Smith's sentencing* if it had not been defrauded into loaning its money to Smith. *See* 18 U.S.C. § 3663(b)(1)(B)(ii) (1988).[4]

Understanding that what Smith stole was capital, the district court did not abuse its discretion. It declined to grant Smith credit for some of the collateral property until after his victims had recovered proceeds from the disposition of that property, and it valued any property that remained unsold at sentencing as of that date. As a matter of dollars and cents, the court's valuation was correct.

## B

The majority reaches the opposite conclusion only because it erroneously treats the five collateral properties as if they are somehow equivalent to the stolen capital. In the majority's view, when Queen City and Gibraltar assumed title to those properties, they effectively received some of their money back. *See ante* at 624–25. That suggestion cannot withstand scrutiny. After all, Queen City would not have invested in Smith's Texas properties if it had not been defrauded into believing that they were reasonable investments. As it turned out, the cash-flow projections for the five borrowing corporations were largely fictional, and the mortgage proceeds, which were in every case designated for development of the underlying property, were sub-

---

**3.** The parties apparently agree—and logic suggests—that this is the applicable provision. *Compare* 18 U.S.C. § 3663(b)(1) *with* 18 U.S.C. §§ 3663(b)(2)–(4).

**4.** As an economic and arithmetical matter, one should be able to determine this number by multiplying the total proceeds loaned to Smith by the real rate of return on all of Queen City's "non-Smith" capital from the respective dates on which the loans closed until the date of sentencing.

stantially diverted to Smith's previous creditors and to other illegitimate uses. To allow Smith to claim credit for the collateral properties as of the date Queen City took title is to allow him some of the benefit of his fraudulent bargain. What Smith stole was capital, and to restore his victims to the status quo ante, he must return the present value of that capital. *See United States v. Angelica,* 859 F.2d 1390, 1394 (9th Cir.1988) (no abuse of discretion in denying credit for defendant's offer of unwanted substitute property).

Moreover, Smith has not argued that he deserves credit for the value of the collateral as of the date his victims *assumed title* to the property. If that were the applicable rule of law, then a mortgagee who possessed title before he became aware of a fraudulent borrower's scam would ultimately be forced to set off the value of the collateral he received in that scam at a point before he even knew that he should be trying to get rid of it. What Smith has argued is that he deserves credit for the collateral as of the date his victimized mortgagees "took control" of the properties. But such argument misses the mark as well. A setoff valuation at that time would also be inappropriate because, as the majority's holding implies, "control" cannot be remunerative without title.

Nor does our decision in *United States v. Tyler,* 767 F.2d 1350 (9th Cir.1985), upon which both the majority and Smith rely, support the court's holding. *See ante* at 624–25. A defrauded lender's assumption of title over collateral property that is itself part of the fraud is in no way analogous to a timber owner's recovery of stolen timber.

In my view, the district court acted well within its authority when it determined that Queen City "received" compensation when it received actual, capital proceeds and not on the earlier dates when it "took control" of or title to the five Texas properties. *See* 18 U.S.C. § 3663(e)(1) (1988). I would therefore affirm the district court's valuation of the victims' losses, and I dissent from my colleagues' contrary conclusion.

## III

In light of the foregoing, I concur in the judgment and in Parts I, II, III, and V–B of the court's opinion. I dissent from Parts IV and V–A.