**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Robert S. GORDON, Defendant–Appellant.**

No. 03–10322.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 15, 2004.

Filed Dec. 30, 2004.

William J. Genego, Santa Monica, CA, for the defendant-appellant.

Kevin V. Ryan, San Jose, CA; Hannah Horsley, San Jose, CA; and David R. Callaway, San Jose, CA, for the plaintiff-appellee.

Before: FERNANDEZ, PAEZ, and CLIFTON, Circuit Judges.

CLIFTON, Circuit Judge:

This case presents the disappointing story of a promising federal appellate law

clerk gone bad. Robert Gordon, a graduate of Stanford Law School and a former law clerk for one of our colleagues, a judge on the U.S. Court of Appeals for the Seventh Circuit, embezzled millions of dollars in cash and stock from his employer, Cisco Systems. Following his guilty plea conviction for wire fraud, 18 U.S.C. § 1343, and insider trading, 15 U.S.C. § 78j(b), Gordon appeals the district court's final order of restitution. The district court imposed restitution in a total amount of $27,397,206.84 under the Mandatory Victims Restitution Act of 1996 ("MVRA"), Title II, Subtitle A of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214, codified in relevant part at 18 U.S.C. §§ 3663A, 3664 (1996). Gordon does not dispute the entire amount of the restitution order but contends that certain portions should not be included. At issue on appeal are the restitution order's award of $12,593,902.23 for embezzled shares from one company; prejudgment interest of $2,424,913.32; and reimbursable investigation costs totaling $1,038,477.00.

■ The primary and overarching goal of the MVRA is to make victims of crime whole. In achieving this objective, Congress intended district courts to engage in an expedient and reasonable restitution process, with uncertainties resolved with a view toward achieving fairness to the victim. Guided by these principles, we hold that the district court's restitution analysis for the embezzled shares, including its fairly sophisticated "date of the loss" calculation, was not an abuse of discretion. Nor did the district court abuse its discretion in declining to account for brokerage house commissions or for awarding restitution for costs incurred by Cisco during its participation in the criminal investigation. Finally, we conclude that the district court did not abuse its discretion in awarding

prejudgment interest in regards to the embezzled cash and shares of the companies Terayon and Cabletron. The district court did, however, abuse its discretion in awarding prejudgment interest for the other embezzled securities. We therefore affirm in part, reverse in part, and remand for entry of a new order of restitution.

## I. BACKGROUND

### A. Statutory Framework

■ The MVRA makes restitution mandatory for particular crimes, including those offenses which involve fraud or deceit. *See* 18 U.S.C. § 3663A(c)(1)(A)(ii). Under the MVRA, a court must order restitution to each victim of an offense, and the court cannot consider the defendant's economic circumstances. *See* 18 U.S.C. § 3664(f)(1)(A). The prior restitution statute, the Victim and Witness Protection Act ("VWPA"), required courts to consider the economic circumstances of the defendant prior to ordering restitution, and the granting of restitution was discretionary, not mandatory. *See* 18 U.S.C. § 3663. With these exceptions, the two statutes are identical in all important respects, and courts interpreting the MVRA may look to and rely on cases interpreting the VWPA as precedent. *See United States v. Randle*, 324 F.3d 550, 555–56 & nn. 2–3 (7th Cir.2003) ("The provisions of the VWPA and the MVRA are nearly identical in authorizing an award of restitution.").

### B. Factual Background and Procedural History

Robert Gordon attended Stanford Law School, where he was an associate managing editor of the *Stanford Law Review*. Upon graduating from law school, Gordon served as a law clerk for a judge on the U.S. Court of Appeals for the Seventh Circuit. Prior to his employment at Cisco,

Gordon was an investment banker at Goldman Sachs and First Boston.

Gordon was employed at Cisco from September 1995 to April 2001. He started at Cisco as a director in the Corporate Finance Department and, in 1999, transferred to the Business Development Group. Through late 1997 until April 2001, Gordon obtained stock certificates from companies in which Cisco had acquired an interest and, instead of depositing those certificates with Cisco's treasury department, transferred them to two brokerage accounts he had established. He then sold the embezzled shares and used the proceeds to make stock trades using information gained from his insider position with Cisco.

In addition, under Gordon's guidance, Cisco loaned $15 million to Spanlink, a start-up company in which Cisco had previously invested. Cisco was not aware, however, that Gordon personally had previously lent Spanlink $5 million, posing as a venture capital investor and using funds previously embezzled by him from Cisco, and that Gordon had received 50,000 shares of Spanlink "Series B" Preferred Stock in return for arranging that loan. After Spanlink received the $15 million, Gordon redeemed the preferred shares for $10 million, turning a $5 million profit for himself.

In April 2001, Cisco discovered that shares were missing from one of the accounts from which Gordon had embezzled stock. Cisco's officers spoke to Gordon about the missing shares. They asked him for his laptop computer. Gordon said his laptop was at home, but he agreed to bring it to Cisco the following day. Gordon was told that he should not erase anything from the hard drive. Yet as confirmed by subsequent forensic analysis, Gordon went home that night and used an "evidence eliminator" software program to delete files from his computer. Further analysis established that Gordon had run that program at least five times to overwrite deleted files.

Discovering that Gordon had embezzled certain shares, Cisco launched an internal investigation to determine the extent of the embezzlement. This involved identifying all the transactions in which Gordon had been involved during his five years with the company. As a result of this investigation, Cisco identified five additional embezzlements totaling more than $13 million in losses to Cisco. Two of these embezzlements involved Cisco's investments in another technology company called Terayon.

In April 2001, the government charged Gordon with wire fraud, and in May 2001, an indictment alleging two counts of wire fraud was returned. Gordon pled guilty to a superseding information alleging two counts of wire fraud, one count of insider trading, and one forfeiture count. Under the plea agreement, Gordon agreed to pay restitution totaling $14,114,372.38 to Cisco and $343,173.40 to the government, and to forfeit the amounts alleged in the forfeiture count. Gordon also agreed to waive his right to appeal his "convictions, the judgment, and orders of the Court," in addition to the right to appeal his sentence. The government reserved the right in the plea agreement to argue for additional restitution for Cisco's "lost opportunity" costs for the Terayon shares, investigation costs, and prejudgment interest.

The district court sentenced Gordon to a term of 66 months in prison. The court scheduled a further hearing pursuant to 18 U.S.C. § 3664(d)(5) to address the disputed issues of restitution. The court established July 30, 2002 (the date of Gordon's guilty pleas) as the cut-off date for prejudgment interest. The district court subsequently issued an order

addressing the areas of restitution and forfeiture that were not contested by the parties and conducted an evidentiary hearing regarding the remaining disputed restitution issues. In the court's Final Order of Restitution, Gordon was ordered to pay restitution totaling $27,397,206.84, including:

(1) $12,593,902.23 for the embezzled Terayon shares;

(2) prejudgment interest of $2,424,913.32; and

(3) reimbursable investigation costs totaling $1,038,477.00.[1]

Both the Final Order of Restitution and Final Order of Forfeiture were incorporated into the Amended Judgment. Gordon timely appealed.

## II. DISCUSSION

### A. Waiver of Right to Appeal

▉ We review de novo the question of whether a defendant has validly waived his statutory right to appeal. *United States v. Anglin*, 215 F.3d 1064, 1066 (9th Cir.2000). A defendant's right to appeal is statutory, rather than constitutional, in nature. *Id.* Knowing and voluntary waivers of appellate rights in criminal cases are "regularly enforce[d]." *Id.* "The sole test of a waiver's validity is whether it was made knowingly and voluntarily." *Id.* at 1068; *see also United States v. Baramdyka*, 95 F.3d 840, 843 (9th Cir.1996) (noting that the "proper enforcement of appeal waivers serves an important function in the judicial administrative process by preserving the finality of judgments and sentences imposed pursuant to valid plea agreements") (quotation marks and citation omitted).

The government argues that because Gordon waived the right to appeal the "orders of the Court" in his plea agreement, he waived his right to appeal the restitution order. At Gordon's plea colloquy, the district court also emphasized its view that Gordon had waived the right to appeal the restitution order. We disagree. Gordon lacked sufficient notice to waive his right to appeal the restitution award. As we held in *United States v. Phillips*, 174 F.3d 1074 (9th Cir.1999), while "[i]t is true that a court can impose restitution when the plea agreement is silent as to the amount of restitution as long as the amount is based on actual damages[,] .... [a]llocating actual damages in this manner ... carries with it a requirement of notice to the defendant." *Id.* at 1076. "Notice was absent in this case due to the ambiguous nature of the plea agreement." *Id.* Gordon's "plea agreement was unclear about exactly what the amount of actual damages would be" for such contested issues as the embezzled Terayon shares, prejudgment interest, and investigation costs. *Id.* Gordon therefore did not waive his right to appeal these contested amounts.

▉ Moreover, "[e]ven if [Gordon] had voluntarily and knowingly waived his general right to appeal, this waiver would not affect his ability to appeal a violation of the[MVRA]." *Id.* A "restitution order which exceed[s] its authority under the [MVRA] is equivalent to an illegal sentence." *Id.* (citation omitted). "[S]uch a restitution order [is] in excess of the maximum penalty provided by statute and, therefore, the waiver of appeal [is] inapplicable to it." *Id.* (quotation marks omitted).

1. Cisco initially sought reimbursement of $1,268,022 for its investigation costs through July 30, 2002. At the restitution hearing, Cisco reduced its request in two categories by a total of $25,761.

## B. Restitution Order

■■■■ "A restitution order is reviewed for an abuse of discretion, provided that it is within the bounds of the statutory framework. Factual findings supporting an order of restitution are reviewed for clear error. The legality of an order of restitution is reviewed de novo." *United States v. Stoddard,* 150 F.3d 1140, 1147 (9th Cir.1998) (citations omitted).

The largest item that Gordon challenges is the district court's restitution award for the embezzled Terayon shares. Gordon argues that in calculating Cisco's losses for the Terayon shares, the district court applied an incorrect "date of the loss" under the MVRA. He also contends that the district court erroneously disregarded the alleged fraudulent inflation of Terayon shares, which he posits constituted an "intervening cause" of Cisco's Terayon related loss. In addition, Gordon argues that the district court abused its discretion in failing to subtract brokerage house commissions costs from its restitution award, in including Cisco's investigation costs as part of its total losses, and in awarding prejudgment interest for the embezzled securities and cash.[2]

### 1. Terayon Shares

Cisco acquired 896,834 Terayon shares in 1995. In December 1998, Gordon, without Cisco's consent, sold short 54,525 of Cisco's Terayon shares. He deposited the $1,635,692 in proceeds from the sale into his brokerage account. In June 1999, Gordon embezzled an additional 100,000 Terayon shares from Cisco's account. He later deposited the shares into his brokerage account and eventually sold them for a total of $7,478,782.93.

#### a. "Date of the Loss" Provision

■■■ Before Gordon's embezzlement was discovered, Cisco sold all of its holdings of Terayon stock. Specifically, Cisco sold all of its shares between July 21, 1999 and March 6, 2001. During this period, the price of Terayon jumped from $46 per share on July 21, 1999 to a high of $285.26 per share on March 9, 2000.[3] The stock price dramatically declined, however. On March 6, 2001, the day Cisco liquidated the last of its Terayon shares, the stock's closing price was $5.47 per share. Cisco, which had no knowledge that Gordon had taken some of its Terayon holdings, would have sold these shares as well except for Gordon's wrongdoing.

In situations where the return of stolen or embezzled property is impossible, impracticable, or inadequate, the MVRA requires defendants to pay victims "the greater of (I) *the value of the property on the date of the* damage, *loss,* or destruction; or (II) the value of the property on the date of sentencing." 18 U.S.C. § 3663A(b)(1)(B)(i)(I)-(II) (emphasis added). In determining the "date of the loss" for the Terayon shares, the district court reasoned that it was "reasonable, equitable and consistent with the purposes of the

**2.** In his July 14, 2004 "Motion for Order Allowing Challenge to Restitution Based on *Blakely v. Washington,"* Gordon asked to be allowed to challenge the restitution order, based in part upon factual determinations made by the district judge, as unconstitutional under the Supreme Court's recent decision in *Blakely v. Washington,* —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). We grant the motion and therefore consider Gordon's constitutional challenge to the district court's restitution award. Gordon's *Blakely* argument is foreclosed by our recent decision in *United States v. DeGeorge,* 380 F.3d 1203 (9th Cir.2004), where we held that a "restitution order made by the district court pursuant to the Victim and Witness Protection Act ... is unaffected by *Blakely." Id.* at 1221.

**3.** These share prices are the day-high values.

restitution statute to consider Cisco's lost opportunity to sell the Terayon shares at a higher price in determining the amount of the loss caused by Defendant's embezzlement of the shares." To reflect Cisco's "lost opportunity" to sell the Terayon shares, the district court held that the "date of the loss" for the embezzled Terayon shares was the date on which it could reasonably be inferred that Cisco would have sold the shares if Gordon had not embezzled them.[4] In these circumstances, though, no single date could be identified, only a range of dates, so the district court calculated the loss using the average closing price of Terayon shares during the entire period in which Cisco liquidated its shares (July 21, 1999 through March 6, 2001). Using calculations that are not themselves disputed, the district court arrived at a restitution figure for the Terayon shares of $12,593,902.23.[5] Gordon ar-

gues that the "date of the loss" should have been the date that the Terayon shares were embezzled, or the "taking date," with a corresponding loss valuation of $6,523,192, more than $6 million less.

The MVRA offers no further elaboration on the "date of the loss" provision. Because it is unclear whether the district court's average stock price valuation method is consistent with the text of the statute, we "must consider'[t]he purpose, the subject matter, the context [and] the legislative history' of this statute." *United States v. Miguel*, 49 F.3d 505, 507 (9th Cir.1995) (quoting *Pfizer, Inc. v. Government of India*, 434 U.S. 308, 313, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978) (alterations in original)). As there is no discussion within the MVRA's legislative history regarding the "date of the loss" provision, we turn to the remedial principles underlying the MVRA and restitution generally.[6]

---

4. Because the district court expressly tied the award to the shares' value on the "date of the loss," we regard the dissent's citation to *United States v. Angelica*, 859 F.2d 1390 (9th Cir. 1988), as misplaced. *See* dissent at 1061–62. In *Angelica*, we rejected an award based on the property's value at the time of purchase. 859 F.2d at 1394. Here the district court did not disregard the statute's "choice of two possible dates," *id.*, but rather exercised its discretion in giving meaning to the first of those statutory choices.

5. In addition to the Terayon shares, Gordon also embezzled Microsoft, Internet Security Systems (ISSX), Convergent Networks, Cabletron, and Broadcom securities. No restitution was ordered for the Convergent stock certificates because Gordon surrendered them to the government. In the cases of Microsoft, ISSX, and Broadcom, the restitution amount was determined, by agreement of the parties, by taking the greater of the dayhigh value for each stock on the date it was taken or the day-high value on the date of sentencing. The district court reasoned that because Cisco had not completely liquidated these securities (unlike Terayon), it would have been speculative to try to determine whether Cisco might have sold the embezzled shares, when it still had

other shares of the same companies in its portfolio.

> As the government concedes, the district court failed to treat the Cabletron shares, which Cisco also sold off in their entirety by the time of the plea agreement, in a manner consistent with its treatment of the Terayon shares. Cisco's complete liquidation of Cabletron was not known at the time of the plea agreement by Gordon or the government. When the true facts came to light, as Gordon acknowledges, the government offered to correct the error. Because the district court apparently did not adopt the government's correction, we order the district court on remand to recalculate restitution as to the Cabletron shares in a manner consistent with its treatment of the Terayon shares.

6. Gordon argues that we should also look to the Sentencing Guidelines for the measure of loss. In sentencing a defendant for fraud the district court must make a "reasonable estimate" of the victim's "loss." U.S.S.G. § 2B1.1 app. n. 3(C). The general rule in a case involving property obtained by fraud is that the measure of loss is "[t]he fair market value of the property unlawfully taken." *Id.*

"[W]e are presented with a statute[,] the primary and overarching goal of which is to make victims of crime *whole,* to *fully* compensate these victims for their losses and to restore these victims to their original state of well-being[,] that expressly directs the sentencing judge to award restitution in an amount equal to 'the value of the property on the date of the damage, loss, or destruction.' " *United States v. Simmonds,* 235 F.3d 826, 831 (3d Cir.2000) (interpreting MVRA) (emphasis added). As we noted in the general restitution context in *Nelson v. Serwold,* 687 F.2d 278 (9th Cir.1982), the "purpose of restitution is ... to restore the defrauded party to the position he would have had *absent* the fraud." *Id.* at 281 (emphasis added).

Guided by the remedial purposes underlying the MVRA, other circuits have granted district courts a degree of flexibility in accounting for a victim's complete losses. For example, in *Simmonds,* the Third Circuit concluded that the district court did not abuse its discretion in calculating the value of the victims' furniture destroyed in a fire under § 3663A at its "replacement value"—that is, "the amount of money necessary to replace the furniture"—rather than at its "market value"—or "the actual price that the furniture in question would have commanded on the open market on the *date* of destruction." 235 F.3d at 830 (emphasis added). The court reasoned that because "furniture often has a personal value to its owners that cannot be captured or accurately estimated by simply determining the market value of the furniture" on a particular date, the district court properly concluded that the replacement value was a more accurate means of accounting for the victims' total losses under the MVRA. *Id.* at 832.

Similarly, other circuits interpreting the MVRA have permitted a degree of flexibility in making victims of securities fraud whole by allowing district courts to place the risk of downward fluctuations in stock prices on defendants rather than victims. In *United States v. Rhodes,* 330 F.3d 949 (7th Cir.2003), the Seventh Circuit affirmed the district court's restitution order under the MVRA, which ordered the defendant, who defrauded a number of investors, to pay his former employer "the amount of money Magna Investments had to dole out in order to make its customers whole as a result of [the defendant's] fraud." *Id.* at 953. The defendant argued that the district court's order was improper under the MVRA because his former employer "immediately liquidated the unauthorized investments [the defendant] had made, thereby incurring losses caused by a dip in the values of those investments and the fact that at least some of the investments were sold before their maturation date." *Id.* Rejecting this argument, the Seventh Circuit reasoned that the defendant should bear the risk of declining stock prices, not the victim: " '[the defendant], rather than the victims, should bear

---

app. n. 3(C)(i). As noted above, the MVRA's purpose is to make the victims whole; conversely, the Sentencing Guidelines serve a punitive purpose, necessitating a different loss calculation scheme than the MVRA. *Compare United States v. Bae,* 250 F.3d 774, 777 (D.C.Cir.2001) (noting that under the Sentencing Guidelines "[l]ost profit is an undesirable measure of loss" because it "would *penalize* frauds differently depending upon whether the victim is a consumer or a producer") (emphasis added) *with United States*

*v. Rice,* 38 F.3d 1536, 1544 (9th Cir.1994) (holding under the VWPA that lost profits *are* permissible and determinable on the date of the taking for restitution purposes because the property had a "book price which includes a profit markup"). While there is little logic in increasing or decreasing a defendant's sentence as a result of unpredictable fluctuating values for misappropriated items in the punitive context, accounting for such fluctuations is necessary in making victims whole in the restitutionary context.

the risk of forces beyond his control. . . . [T]o the extent that the interest rates have come into play in calculating the amount of loss, they have done so due to [the defendant's] own conduct.' " *Id.* (quoting district court opinion); *cf. Nelson,* 687 F.2d at 281 (holding that "where a person with knowledge of the facts wrongfully . . . acquires property . . . . of fluctuating value, such as stock, the injured party may be awarded an amount equal to the highest value reached by the stock within a reasonable time *after* the tortious act" (emphasis added)).

The district court's "date of the loss" determination is consistent with the remedial purposes underlying the MVRA and restitution generally. The district court reasonably construed the loss to Cisco concerning the Terayon stock to be its inability to liquidate the stock between July 21, 1999 and March 6, 2001 and therefore the "date of the loss" to be each possible date within that particular period. Absent Gordon's illegal conduct, which notably included the purposeful concealment of his misappropriations, Cisco would have had the opportunity to sell the embezzled stock at a given market value on *each* possible date, which it clearly intended to do.[7]

Because Cisco lacked knowledge as to Gordon's activities, it was unable to liquidate the embezzled Terayon shares throughout this period. The district court therefore concluded that Gordon, rather than Cisco or the government, should bear the risk associated with the fluctuations in Terayon's share value.

A brief examination of the "taking" date, the alternative "date of the loss" proposed by Gordon, illustrates the reasonableness of the district court's restitution method in making Cisco "whole" under the MVRA.

On the date of Gordon's first "taking" of 54,525 shares, December 14, 1998, Terayon's day-high value was $30.12 per share. On the date of Gordon's second taking of 100,000 shares, June 24, 1999, Terayon's day-high value was $48.88 per share. But it is undisputed that (1) Cisco did not know on these dates that the shares had been taken, (2) Cisco did not intend to sell any Terayon shares on these dates, and (3) Cisco did sell all of its Terayon shares, mostly for prices higher than these, before Gordon's embezzlement was detected. Under those circumstances it is plain that limiting the restitution amount to the value of the shares on the date Gordon secretly stole them would underestimate Cisco's loss. But for Gordon's misconduct, Cisco would have sold those shares at higher prices and would have made substantially more money. The "taking" date is an appropriate "date of the loss" for the other securities that Cisco did not completely liquidate because it is too speculative to conclude that Cisco would have sold those securities absent Gordon's wrongdoing. In the Terayon context, however, the district court sensibly concluded that the "taking" date would have prevented the district court from accounting for Cisco's total losses.

That said, it is important to note that the legislative history of the VWPA demonstrates that Congress intended the restitution process to be quick and reasonable. *See* S.Rep. No. 97–532, at 31 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2515, 2537 ("[W]here the precise amount [of restitution] owed is difficult to determine, [18 U.S.C. § 3664] authorizes the court to reach an expeditious, reasonable determination of appropriate restitution by resolving uncertainties with a view toward

---

7. The court's average or mean stock price measure was a reasonable manner to account for Cisco's total losses. Gordon's argument that the district court should have applied the median stock price is unsupported by law or reason.

achieving fairness to the victim."). While the district court did engage in a fairly sophisticated analysis in determining the restitution amount for the Terayon shares, the record demonstrates that it was not so complex as to be unreasonable, burdensome, or dilatory. Moreover, the court's calculations were undertaken with a view toward achieving fairness to the victim.

To be clear, we do not hold that the district court was required to undertake this particular restitution exercise in determining the "date of the loss" for the embezzled Terayon shares.[8] Rather, we only hold that the district court did not abuse its discretion in doing so.[9]

### b. Intervening Cause

■ Gordon argues in the alternative that the district court abused its discretion in including in its determination of the average Terayon share value the price of Terayon stock between July 21, 1999 and July 12, 2000 because, he contends, during that period Terayon's share price was fraudulently inflated. He cites a pending class action lawsuit in support of his assertion that a "dramatic spike" in Terayon's share price coincided with false statements by Terayon insiders. Gordon describes the spike as an "intervening cause" to Cisco's loss. He does not allege that Cisco was involved or aware of such alleged false statements.

■ "[T]he main inquiry for causation in restitution cases [is] whether there was an intervening cause and, if so, whether this intervening cause was directly related to the offense conduct." *United States v. Meksian,* 170 F.3d 1260, 1263 (9th Cir. 1999). The purported "intervening cause" in this case—the alleged fraudulent inflation of the price of Terayon stock—is not "an intervening cause" because it did not "cause" the loss to Cisco, but merely adversely affected the value of the property that Gordon embezzled. Though the extent of Cisco's loss may have been affected by outside forces, Gordon's conduct—and his alone—directly resulted in the loss. *Cf. Rhodes,* 330 F.3d at 953 (" '[The defendant], rather than the victims, should bear the risk of forces beyond his control ....' " (quoting district court opinion)); *Meksian,* 170 F.3d at 1263 (reversing a restitution order and concluding that the loss to the lender was caused *not* by the defendant's false tax returns but "by the contaminated nature of the loan property" and by the lender's reliance on an inaccurate environmental risk report prepared by a third party). Moreover, even if Gordon's claims regarding an inflated stock price were true, there is no reason to believe that, absent Gordon's conduct, Cisco would have been prevented from selling the Terayon shares and realizing whatever premium may have been generated by such alleged fraudulent behavior. The market prices were available to Cisco, no matter how the market prices came to be.

It would have been unreasonable, in any event, to expect the district court to dis-

**8.** We thus disagree with the dissent's contention that "a judge who does not wish to engage in the complex exercise approved of here will have to ... entertain it in order to see if it can be discretionarily rejected." Dissent at 1062. Although parties may argue as much, *id.* at 1062 n. 2, these arguments should not succeed, since the complexity of the determination is itself one of the factors the court may properly weigh. As a matter of logic, our limited holding—that the district court did not abuse its discretion by engaging in this exercise—does not indicate that the dissent's inverse proposition is also true.

**9.** As noted above in footnote 5, the district court is ordered on remand to recalculate restitution for the embezzled Cabletron shares in a manner consistent with its treatment of the Terayon shares.

count accurately the restitution amount to reflect as of yet unproved fraudulent behavior alleged in pending litigation among third parties. As noted above, the legislative history of the VWPA demonstrates that Congress intended the restitution process to be quick and reasonable. *See* S.Rep. No. 97–532, at 31.

We therefore conclude that the district court did not abuse its discretion in declining to take into account the alleged fraudulently induced spike in the value of Terayon shares.

### 2. Brokerage House Commissions

■■■ Gordon contends that to be an accurate approximation of the "lost opportunity" loss, the restitution amount would have to be based on the net proceeds to Cisco *after* brokerage commissions costs. Without accounting for brokerage commission costs, the restitution order arguably compensates Cisco for more than it ultimately lost. *See United States v. Quillen,* 335 F.3d 219, 222 (3d Cir.2003) (noting that restitution under the MVRA "must be limited to 'an amount pegged to the *actual* losses suffered by the victims of the defendant's criminal conduct' ") (quoting *United States v. Barany,* 884 F.2d 1255, 1260–61 (9th Cir.1989)).

The record is insufficient, however, to allow a court to deduct accurately the commissions from the restitution award. The pages of the record Gordon points to are merely receipts from various brokerages houses that show the commission paid on sales of certain blocks of shares. Nothing within the record provides a commission percentage rate for a particular brokerage house or a detailed list of which securities were bought and sold through which hous-

es. 18 U.S.C. § 3664(a) directs that before making an order of restitution, the district court should review, to the "extent *practicable,* a complete accounting of the losses." *Id.* (emphasis added). Because the record does not indicate what percentage of shares Cisco bought and sold through which particular brokerage houses, or what the commission rates for each house were, the district court reasonably concluded that it would have been impractical for it to account for the brokerage house commissions in its restitution award.

Given that Congress intended the restitution process to be expedient and reasonable, with courts resolving uncertainties with a view toward achieving fairness to the victim, we hold that the district court did not abuse its discretion in declining to account for the brokerage house commissions.

### 3. Investigation Costs

■■■ Gordon also argues that the district court abused its discretion in ordering him to pay Cisco's investigation costs. 18 U.S.C. § 3663A(b) provides in relevant part:

(b) The order of restitution shall require that such defendant—

. . .

(4) in any case, reimburse the victim for lost income and necessary child care, transportation, and *other expenses incurred during participation in the investigation or prosecution of the offense* or attendance at proceedings related to the offense.

*Id.* (emphasis added).[10]

■■■ "This circuit has adopted a *broad* view of the restitution authorization [for

---

**10.** Gordon agreed in his plea agreement that he would be required to "reimburse [Cisco] for necessary ... expenses incurred during participation in the investigation and prosecu-tion of the offense" pursuant to 18 U.S.C. § 3663A(b)(4), but reserved the right to contest the amounts claimed.

investigation costs]." *United States v. Phillips*, 367 F.3d 846, 863 (9th Cir.2004) (citation omitted) (emphasis added). Generally, investigation costs—including attorneys' fees—incurred by private parties as a "direct and foreseeable result" of the defendant's wrongful conduct "may be recoverable." *Id.; see also United States v. Cummings*, 281 F.3d 1046, 1051–53 (9th Cir.) (holding that the district court properly included in the restitution order attorney's fees incurred by a mother in separate state and international proceedings to recover children whom the defendant wrongfully removed), *cert. denied*, 537 U.S. 895, 123 S.Ct. 179, 154 L.Ed.2d 162 (2002); *United States v. Hayward*, 359 F.3d 631, 642 (3d Cir.2004) (holding that the district court correctly concluded that parents were entitled to restitution under the MVRA for "reasonable costs in obtaining the return of their victimized children from London and in making their children available to participate in the investigation and trial"); *United States v. Piggie*, 303 F.3d 923, 928 (8th Cir.2002) (concluding, under plain error review, that the district court properly included in a restitution order investigation costs and fines that a university incurred because they were caused by the defendant's conduct), *cert. denied*, 538 U.S. 1049, 123 S.Ct. 2114, 155 L.Ed.2d 1090 (2003).

The district court reasonably concluded that Cisco's investigation costs, including attorneys' fees, were necessarily incurred by Cisco in aid of the proceedings. Cisco's investigation costs were a direct and foreseeable result of Gordon's actions. The record demonstrates that Cisco's investigation costs were incurred in response to five grand jury subpoenas and a number of government requests requiring Cisco to analyze vast amounts of documentation and electronic information. Cisco was required to retrieve every item regarding its investments in 20 companies that were the subject of possible insider trading by Gordon, and over 40 companies that were identified as candidates for Gordon's possible embezzlement of Cisco-owned shares or proceeds. Cisco was forced to identify and reconstruct hundreds of sales and acquisitions from which Gordon might have been able to embezzle proceeds. Gordon purposefully covered his tracks as he concealed his numerous acts of wrongdoing from Cisco over a period of years. As the victim, Cisco cannot be faulted for making a concerted effort to pick up his trail and identify all the assets he took amid everything he worked on.

The district court carefully analyzed Cisco's requests. Cisco's investigation included a forensic analysis of Gordon's computer to determine whether the "eliminated" evidence could be restored. The district court reduced the award for this analysis, finding that the evidence "does not support fully the extraordinary expense associated with Cisco's attempt to recover data from Defendant's laptop computer," and made other reductions, finding that "several categories for which expenses are claimed are at least to some extent overlapping or duplicative." Indeed, the district court ultimately ordered reimbursement for $1,038,477 of the total of $1,268,022 for which Cisco had sought reimbursement.

We therefore conclude that the district court did not abuse its discretion in awarding restitution for Cisco's investigation costs.

### 4. Prejudgment Interest

 The district court awarded prejudgement interest on all assets, both cash and stock. For all assets excluding the Terayon shares, the district court set the interest accrual date as the date the assets were taken by Gordon, and the in-

terest termination date as July 30, 2002.[11] The district court applied the prevailing government interest rate in effect on the date of the misappropriation. For the Terayon shares, the district court used a slightly different calculation method. Because the district court concluded that Cisco's Terayon loss occurred between July 21, 1999 and March 6, 2001, when Cisco had completed liquidating the Terayon shares and its losses became "fixed," the court set the accrual date for prejudgment interest as March 6, 2001. The district court also set the interest termination date as July 30, 2002, using the prevailing government interest rate in effect on March 6, 2001.[12]

Though the MVRA is silent on the issue of prejudgment interest, we have held that the VWPA "authorizes restitution for a victim's '*actual* losses'" and that "[f]oregone interest is one aspect of the victim's actual loss." *United States v. Smith*, 944 F.2d 618, 626 (9th Cir.1991) (interpreting the VWPA) (emphasis added). A number of other circuits have likewise held that restitution under the MVRA or the VWPA may include prejudgment interest. *See United States v. Shepard*, 269 F.3d 884, 886 (7th Cir.2001) (construing *Government of Virgin Islands v. Davis*, 43 F.3d 41, 47 (3d Cir.1994)) (construing VWPA); *United States v. Hoyle*, 33 F.3d 415, 420 (4th Cir.1994) (construing VWPA); *United States v. Patty*, 992 F.2d 1045, 1050 (10th Cir.1993) (construing VWPA); *United States v. Rochester*, 898 F.2d 971, 983 (5th Cir.1990) (construing VWPA).[13]

---

**11.** The termination date of July 30, 2002 was agreed upon by the parties.

**12.** Gordon argues that the district court abused its discretion in not using the then current 1.25% interest rate. Under federal law the rate of prejudgment interest is the Treasury Bill rate as defined in 28 U.S.C. § 1961 unless the district court finds on substantial evidence that a different prejudgment interest rate is appropriate. *See Blanton v. Anzalone (II)*, 813 F.2d 1574, 1576 (9th Cir. 1987); *Blanton v. Anzalone (I)*, 760 F.2d 989, 992–93 (9th Cir.1985). We have held that the applicable prejudgment interest rate is the one in effect immediately *prior* to the date of the wrongful conduct which caused a plaintiff's loss. *See Anzalone (I)*, 760 F.2d at 992–93. Though the district court arguably should have used the rate in effect at the time of Gordon's misappropriations of the Terayon shares, the court's use of the rate in effect on March 6, 2001 is consistent with its view that the harm of Gordon's wrongdoing occurred during the liquidation period. Moreover, Gordon does not raise this argument on appeal. The district court therefore did not abuse its discretion in applying the interest rate in effect on the date of Gordon's wrongful conduct for all assets excluding the Terayon shares, and on March 6, 2001 for the Terayon shares.

**13.** The contrary cases cited by the dissent, *United States v. Rico Industries, Inc.*, 854 F.2d 710 (5th Cir.1988), and *United States v. Sleight*, 808 F.2d 1012 (3d Cir.1987), interpreted the Federal Probation Act rather than the VWPA or MVRA. *See* dissent at 1063 & n. 4. In that context, the *Sleight* court noted that while "one purpose of restitution under the Federal Probation Act is to make the victim whole, restitution ... remains inherently a criminal penalty." 808 F.2d at 1020. The court accordingly applied the "general rule that a criminal penalty does not bear interest." *Id.*

It is apparent that our court and other courts have not applied that rule to restitution under the VWPA or MVRA, since prejudgment interest has been awarded in at least some instances, as the dissent acknowledges. In contrast to the Federal Probation Act, making the victim whole is not "one purpose" of restitution under the MVRA, but rather its "primary and overarching goal." *See Simmonds*, 235 F.3d at 831. In this context, which we regard as restitutionary rather than punitive, *see supra* note 6, Congress's aim "to fully compensate these victims for their losses," *Simmonds*, 235 F.3d at 831, is best served by awarding prejudgment interest where the victim's actual losses include lost opportunities to use property for productive pur-

Gordon first argues that an award of prejudgment interest is unwarranted in this case because it does not constitute an "actual loss" to Cisco, who, unlike the victim in *Smith*, is not a "financial institution" that has a "tangible expectation" to earn interest on its cash reserves. Additionally, Gordon contends that if interest should apply to any of the securities, it should only apply to the Terayon shares, because by Cisco's admission, the other securities would have been held had Gordon not embezzled them. We consider each argument in turn.

■ Gordon's first argument is unavailing. "Prejudgment interest reflects the victim's loss due to his inability to use the money for a *productive* purpose, and is therefore necessary to make the victim whole." *Patty*, 992 F.2d at 1050 (emphasis added). In *Smith* we held that this proposition is particularly true when the victim is a financial institution because "[f]oregone interest is one aspect of the victim's actual loss." *Smith*, 944 F.2d at 626. We in no way limited this holding to financial institutions, however. Indeed, other circuits have allowed restitution for prejudgement interest to other parties, such as individuals and family estates. *See Shepard*, 269 F.3d at 886 (awarding prejudgement interest where "the money came from an interest-bearing account" of a defrauded 87–year–old woman); *Davis*, 43

F.3d at 43, 47 (allowing prejudgement interest where the embezzled cash came from "the estate of James Merrills Rice").

As a corporation, Cisco is likewise eligible for prejudgment interest restitution. While Cisco would not necessarily have placed its stock proceeds in an interest bearing account had Gordon not embezzled the securities,"interest" is simply a proxy for a "lost opportunity." *See Davis*, 43 F.3d at 47 ("Lost interest translates into lost opportunities, as it reflects the victim's inability to use his or her money for a productive purpose."). The district court's award of prejudgment interest reflects the "productive purposes" for which a profit maximizing entity like Cisco uses its cash reserves.[14]

■ Gordon's second argument, however, has merit. While the district court appropriately included prejudgment interest for the embezzled cash and the Terayon and Cabletron[15] shares, both of which Cisco completely liquidated, the court abused its discretion in awarding prejudgment interest for the other securities. As Cisco acknowledged, it had no intention of completely liquidating the other securities from the date of their taking to the date of judgment. Indeed, it was for this reason that the district court determined that the "date of the loss" for the other securities was the date of the misappropriation. Be-

---

poses. In specific terms, restitution here is premised on the conclusion that, but for Gordon's criminal acts, Cisco would have sold the shares in question and would have obtained money in return. It is appropriate to recognize the loss of the opportunity represented by the time value of that money.

14. Indeed, Cisco's annual financial report contains a separate section devoted to "Interest Income." *See* Cisco Systems, Inc., 2003 Annual Report 25, *available at* http://www.cisco.com/warp/public/749/ar2003/ pdf/AR_6dfinancial_6dreview.pdf.

15. Though the district court rightly awarded prejudgment interest for the Cabletron shares, it did not take into account the fact that Cisco completely liquidated these stocks. On remand, the district court is ordered to calculate prejudgment interest for the Cabletron shares in a manner similar to its treatment of the Terayon shares, setting the accrual date as the date that the losses became "fixed" (i.e., the date of final liquidation for the Cabletron shares) and the termination date as the agreed date of July 30, 2002, and using the government interest rate in effect on the "fixed" date.

cause it is too speculative to conclude that Cisco would have liquidated these securities and placed the cash proceeds in an interest bearing account or used them for some other productive purpose, prejudgment interest on these securities cannot constitute an "actual loss" to the victim. The district court's award of prejudgment interest for these embezzled stocks goes beyond making Cisco whole and is therefore unauthorized under the MVRA. *See Smith,* 944 F.2d at 626.

We therefore conclude that the district court abused its discretion with regard to its award of prejudgment interest on all securities excluding the Terayon and Cabletron shares.

## III. CONCLUSION

Congress passed the MVRA to make victims of crime whole. Mindful of this overarching objective, we are also cognizant of Congress's desire that the restitution process be expedient and reasonable, with courts resolving uncertainties with a view toward achieving fairness to the victim. We thus hold that the district court's restitution analysis for the embezzled Terayon shares, including its fairly sophisticated "date of the loss" calculations, was not an abuse of discretion.[16] Nor did the district court abuse its discretion in declining to account for the brokerage house commissions or in awarding restitution for costs incurred by Cisco during its participation in the criminal investigation. Finally, we conclude that the district court did not abuse its discretion in awarding Cisco prejudgment interest in regards to the embezzled cash and shares of the companies Terayon and Cabletron.[17] The dis-

trict court did, however, abuse its discretion in awarding prejudgment interest for the other embezzled securities.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED.** Each party to bear its own costs.

FERNANDEZ, Circuit Judge, concurring and dissenting:

I concur in the majority opinion, with the exception of parts II, B–1 and II, B–4, as to which I dissent.

Congress did, no doubt, want to help make victims of crimes whole when it enacted 18 U.S.C. § 3663A. However, Congress also hoped to avoid creating a system that would, essentially, turn criminal sentencing hearings into complicated, prolonged trials of the normal civil variety. *See* 18 U.S.C. § 3663A(c)(3)(B). Therefore, Congress did not provide that a victim could simply recover the damages that would, or might, be available in a typical civil case. Rather, when it came to defining the nature of restitution in the property area, Congress provided that if an offense resulted "in damage to or loss or destruction of property," and if mere return of the property would be "impossible, impracticable, or inadequate," the miscreant should pay an amount that represented "the value of the property on the date of ... loss," or "on the date of sentencing," whichever was greater, less the actual value of the part of the property that was returned. *Id.* § 3663A(b)(1).

No doubt, courts can massage and explicate the "date of loss" concept, but no authority supports doing what the district

---

**16.** As noted above in footnote 5, we order the district court on remand to recalculate restitution as to the Cabletron shares in a manner consistent with its treatment of the Terayon shares.

**17.** As noted above in footnote 15, we order the district court on remand to recalculate prejudgment interest for the Cabletron shares in a manner consistent with its treatment of the Terayon shares.

court did here. *See Hughey v. United States,* 495 U.S. 411, 415–18, 110 S.Ct. 1979, 1982–83, 109 L.Ed.2d 408 (1990) (scope and amount of restitution limited by language of statute authorizing issuance of restitution order);[1] *Gamma Tech,* 265 F.3d at 927–28 (affirming restitution order that set victim's loss as of time of overpayment on contracts procured through illegal kickbacks). Indeed, when interpreting identical language of an earlier criminal restitution statute, in a case where the victims had purchased diamonds at an earlier time and were then fraudulently induced to send them to the defendant to sell, we stated:

> The VWPA grants the sentencing judge substantial discretion over the entire process leading to an ultimate restitution order. As part of the process, the judge must decide in a particular case, whether the imposition of the order will unduly complicate or prolong the sentencing process. Here, the district court determined the amount of restitution based upon evidence presented at trial and in a presentence report showing the value of the diamonds at the time they were initially purchased by the victims.... While the district court has discretion in ordering restitution, ... the award must be within the statutory framework. Because the amount of restitution ordered in this case was based neither on the value of the diamonds on the date of loss, nor on their value at the date of sentencing, the restitution order was beyond the authority

granted by the statute. Although valuing the diamonds as of the date of loss or sentencing may present a difficult determination for the district court, the choice of two possible dates of valuation is stated unambiguously in [the VWPA]. We must therefore remand to the district court for valuation of the diamonds on one of those two dates.

*United States v. Angelica,* 859 F.2d 1390, 1394 (9th Cir.1988) (internal quotation marks and citations omitted).

It seems to me that when an item is stolen from someone, that is the date upon which the person lost it. The concept that he lost it on some other date to be determined in the future, perhaps many years later, does not take account of the normal use of language. Usually we think of something as "lost" when it has been parted with or when it has gone out of our possession. That is the date that we suffer our loss.

Of course it can be argued that if the person had kept the item it would have been worth a lot more a few years later, or a lot less, or at some point more and at a later point even less, but that is decidedly not the date that the property was lost; it is not the date that Congress selected. Congress selected the date that the loss truly occurred; that is when the property was lost to the victim.

Nor am I able to accept the proposition that the property is not lost until the victim knows that it is gone. When a dia-

---

1. *Hughey* and other cases cited in this section discuss § 3663 (or its predecessor statute formerly codified at 18 U.S.C. § 3579) whereas Gordon's restitution was ordered under § 3663A. Section 3663 *permits* restitution for crimes that do not fall within § 3663A, whereas § 3663A *mandates* restitution for certain specified crimes. The relevant text in each section, is the same. *Compare* 18 U.S.C. § 3663(b)(1), *with id.* § 3663A(b)(1). *Hu-*

*ghey* was modified by enactment of and amendments to § 3663, but the differences do not involve the merits of Gordon's challenges to his restitution order. *See Hughey,* 495 U.S. at 413 n. 1, 110 S.Ct. at 1981 n. 1 (discussing recodification of §§ 3579–80 at §§ 3363–64); *United States v. Gamma Tech Indus., Inc.,* 265 F.3d 917, 927 n. 10 (9th Cir.2001) (describing effect of amendments to § 3663 on the holding of *Hughey* ).

mond is stolen from a victim's jewelry box, or a share of stock from his portfolio, it is lost to him, whether he knows that or not. Surely the date that he loses the piece of property should not depend upon the sophistication of his inventory process, or upon his memory of precisely where it ought to be at some precise time. It is undoubtedly lost on the date it is taken from him, regardless of how quickly he discovers that.

Finally, the thought that a district court can choose to adopt the complex system of deciding loss that was adopted by the district court in this case, or can choose to adopt some other view of when a loss takes place, does not help very much. Discretion in the legal world is not the unfettered right to do whatever you like. We have always been admonished that, at the very least, the asymptotes bounding judicial discretion are composed of a proper assessment of the facts and the law. *See, e.g., Koon v. United States,* 518 U.S. 81, 97–100, 116 S.Ct. 2035, 2046–47, 135 L.Ed.2d 392 (1996); *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990); *Retail Flooring Dealers of Am., Inc. v. Beaulieu of Am., LLC,* 339 F.3d 1146, 1150 (9th Cir.2003); *Montrose Chem. Corp. of Cal. v. Am. Motorists Ins. Co.,* 117 F.3d 1128, 1133 (9th Cir.1997); *United States v. Schlette,* 842 F.2d 1574, 1577 (9th Cir. 1988); *cf. Olvera v. Giurbino,* 371 F.3d 569, 573–74 (9th Cir.2004) (saying that it

has discretion but *must* exercise it in a particular way). Thus, a judge who does not wish to engage in the complex exercise approved of here will have to try it out first—entertain it in order to see if it can be discretionarily rejected.[2] He may even have to consider other more complex possibilities. That, again, is far from calculating the values on one of the two easily determined discreet dates selected by Congress.[3]

In addition, I see no basis for considering prejudgment interest to be a part of criminal restitution where an item of property was taken, and we are referred to no case where that has been done. In fact, absent other facts, it is rank speculation to say that if a person had the asset, whatever it was, he would have kept it, or earned interest on it, or earned interest on the equivalent of its value.

In fact, every similar case that I have discovered deals with a situation where the property taken was "money," and that money was being loaned at a given interest rate or was contained in an interest bearing account or instrument when it was taken. *See, e.g., United States v. Morgan,* 376 F.3d 1002, 1014 (9th Cir.2004) (contractual interest on credit card charges); *United States v. Smith,* 944 F.2d 618, 620, 626 (9th Cir.1991) (defendant falsified loan applications and subsequently defaulted on inadequately secured loans); *see also United States v. Shepard,* 269 F.3d 884,

---

**2.** We engage in self hypnosis when we think that this case will not be used to argue that a district court has abused its discretion if it has failed to consider the factors outlined in the majority opinion. As we have so often seen, a panel's bewitching of itself will not ensorcel either counsel or other judges once a decision is on the books.

**3.** In fact, in the case at hand the district court had no clue about what date to use. Why not say that Cisco would have sold the embezzled

shares on the date the price was lowest, which was when it sold its remaining shares? Or highest? Or ... ? And if the principle spelled out by the majority does not apply where Cisco failed to sell all shares of a security because it is too speculative to say it would have sold the embezzled shares (*see* footnote 5 of the majority opinion), why is it not equally speculative to say that Cisco would have sold any of the embezzled shares before the date of its last sale?

886 (7th Cir.2001) (money stolen from interest-bearing account); *Virgin Islands v. Davis,* 43 F.3d 41, 46–47 (3rd Cir.1994) (fraudulently acquired certificates of deposit); *United States v. Hoyle,* 33 F.3d 415, 416–18, 420 (4th Cir.1994) (student loan fraud); *United States v. Patty,* 992 F.2d 1045, 1047–48, 1049–50 (10th Cir. 1993) (bank loan fraud); *United States v. Rochester,* 898 F.2d 971, 982–83 (5th Cir. 1990) (restitution included outstanding balance and accrued interest on bank loan); *cf. United States v. Simpson,* 8 F.3d 546, 548, 552 (7th Cir.1993) (affirming a restitution award that included interest on some victims' losses from fraudulent investment schemes where swindler had, inter alia, misrepresented guaranteed rate of return); *United States v. Stephens,* 374 F.3d 867, 869–70 (9th Cir.2004) (restitution order for past due child support payments may include prejudgment interest where state law mandates that interest be paid on delinquent child support obligations). Indeed, where the misappropriated property, although cash or cash equivalent, was not interest bearing property, other circuits have determined that restitution does not properly include prejudgment interest because "a criminal penalty does not bear interest," and the courts were hesitant to infer additional criminal penalties beyond those specifically provided by statute. *See United States v. Rico Indus., Inc.,* 854 F.2d 710, 711–12, 714 (5th Cir.1988) (reversing order to pay prejudgment interest on amount ordered to be paid as restitution for criminal kickback scheme); *United States v. Sleight,* 808 F.2d 1012, 1014–15, 1020 (3d Cir.1987) (same).[4] In a true money-at-interest case, the interest can be said to be a part of the property taken on the date of the loss itself, or, at worst, on the date of sentencing. Either the miscreant

has agreed to pay interest, or the funds from which the money were taken did pay interest. At any rate, those cases are no authority for the proposition that prejudgment interest should be awarded each time an item has been lost to one of society's rascals or rogues.

Of course, nothing I have said is intended to detract from or denigrate a victim's multitudinous remedies in a typical civil case. But a typical civil case is designed to explore the many nuances involved in determining just how much damage was inflicted upon the victim by the wrongdoer. As we all know, that can involve months and years of litigation, expensive discovery proceedings, motion proceedings, and all of the other things that go into the mix of arriving at a just result in a civil case. That is not this case. In fine, we should not inflict this sort of thorny complexity upon all of the district courts in this circuit, even if a few district judges enjoy embracing this genus of legal cacti.

Thus, I concur, except in the portions already indicated, as to which I respectfully dissent.

---

4. Restitution in *Rico* and *Sleight* was awarded under the Federal Probation Act, which, like § 3663A, made no reference to prejudgment interest. *See Sleight,* 808 F.2d at 1019.