**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0327n.06

Nos. 09-6075, 09-6114, 09-6116

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*May 17, 2011*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | WESTERN DISTRICT OF TENNESSEE |
| BILLY W. BRUCE, PAMELA D. | ) | |
| SALYERS, and WILLIAM L. SALYERS, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

Before: MOORE and STRANCH, Circuit Judges; and COHN, District Judge.[*]

**AVERN COHN, District Judge**. This is a criminal case. In these consolidated appeals, defendants-appellants Billy Bruce ("Bruce"), Pamela Salyers, and William Salyers[1] appeal from their convictions and sentences for violating the Lacey Act, 16 U.S.C. § 3372(a)(2)(A) (1981). As will be explained, Bruce and the Salyerses were found guilty of involvement in a conspiracy to harvest and sell undersized freshwater washboard mussels. The Salyerses purchased undersized mussels from Bruce and others. The Salyerses would then process the mussels and resell them to others involved in the conspiracy. On appeal, Bruce argues that (1) the indictment was insufficient because the underlying state statute and proclamation which form the basis for the charges are vague, and (2)

---

[*]The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

[1]To avoid confusion, the Salyerses, where appropriate, will be referred to using their full names.

the district court erred in admitting certain evidence at trial. Pamela Salyers argues that (1) the evidence was insufficient and (2) her sentence is procedurally and substantively unreasonable. William Salyers argues that (1) the award of restitution was improper, and (2) he was entitled to a downward departure based on his medical conditions and his sentence is unreasonable because of a disparity among his co-defendants. For the reasons that follow, we affirm defendants' convictions and sentences.

## I. Background

The Salyers esco-owned 191 Auto Salvage, LLC, located in Holladay, Tennessee. The Salyerses used the business to purchase scrap metal and mussel shells. The Salyerses employed at least five individuals, including: Timmy Robbins, Charles Arnold, Terry Arnold, James Robbins, and Matthew Stone, as well as other individuals part time. From approximately April 11, 2003 to October 27, 2004, the United States Fish and Wildlife Service conducted an undercover operation during which, on four separate occasions, the Salyerses purchased a total of 4,516 pounds of undersized mussel shells originating in Tennessee and Alabama. The investigation revealed that the Salyerses purchased these shells from Bruce, Jim Snowden, Larry Baker, Sean Aber, James Wilson, and Vince Polk. At some point, William Salyers was approached by U.S. Fish and Wildlife officials and agreed to set up a sale to Tungyuan Shin, his buyer for these undersized mussels.

On August 28, 2006, a grand jury issued a multiple-count indictment against eleven individuals, some of whom are named above. The indictment charged conspiracy in violation of 18 U.S.C. § 371 (1994), and violations of the Lacey Act. In broad terms, the Lacey Act is a federal law which is used to assist states "in enforcing their wildlife protection laws by making it a federal crime 'to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce any

2

fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State. . . .'" *United States v. Bryant*, 716 F.2d 1091, 1093 (6th Cir. 1983) (quoting 16 U.S.C. § 3372(a)(2)(A) (1981)). The underlying state laws are a Tennessee state statute, Tenn. Code Ann. § 70-4-102(A), Tennessee Wildlife Resources Commission Proclamation 99-6, an Alabama statute, Ala. Code § 9-2-8, and Alabama Wildlife and Freshwater Fisheries Regulation 220-2-.49, all of which generally regulate the size of freshwater washboard mussels which may be harvested.

For their roles, Bruce and the Salyerses were charged as follows:

| | |
|---|---|
| Bruce | Count 1, conspiracy to violate the Lacey Act, in violation of 18 U.S.C. § 371 |
| Pamela Salyers | Count 1, conspiracy to violate the Lacey Act, in violation of 18 U.S.C. § 371<br>Counts 2, 3, and 4, purchase, sale and receipt of wildlife with a market value in excess of $350 transported in interstate commerce, in violation of 16 U.S.C. § 3372(a)(2)(A) and 16 U.S.C. § 3373(d)(1)(B) |
| William Salyers | Count 1, conspiracy to violate the Lacey Act, in violation of 18 U.S.C. § 371<br>Counts 4, 5, 6, 7, purchase, sale and receipt of wildlife with a market value in excess of $350 transported in interstate commerce, in violation of 16 U.S.C. § 3372(a)(2)(A) and 16 U.S.C. § 3373(d)(1)(B) |

Prior to trial, five of the defendants charged with conspiracy in Count 1 pled guilty under plea agreements. They were sentenced, before a different district judge, to either probation or probation with a period of house arrest.

Also prior to trial, Bruce moved to dismiss the indictment on the grounds that the underlying state laws are vague. Following a hearing, the district court denied the motion.

In November of 2008, Bruce and the Salyerses went to trial before a jury. Tungyuan Shin, Charles Arnold, and Larry Baker testified at trial as part of their plea agreements. During the trial, the Salyerses moved for a mistrial after the government attempted to impeach a defense witness with

3

a prior conviction older than ten years without giving proper notice. The district court granted the motion as to William Salyers, but denied it as to Pamela Salyers. Trial continued against Bruce and Pamela Salyers.

The jury convicted Bruce and Pamela Salyers as charged. After the conclusion of Bruce and Pamela Salyers's trial, William Salyers pled guilty without a plea agreement to all counts charged against him in the indictment.

Bruce and the Salyerses were sentenced at the same hearing. Bruce was sentenced to 24 months custody and ordered to pay $15,000.00 in restitution. Pamela Salyers was sentenced to 12 months and one day, which was a variance from the 21-27-month advisory guidelines range, and ordered to pay $50,000.00 in restitution, jointly and severally with Pamela Salyers and Shin. William Salyers was sentenced to 20 months, a variance from the 24-30-month advisory guidelines range, and ordered to pay $50,000.00 in restitution, jointly and severally with Pamela Salyers and Shin. The district court further required that Pamela Salyers begin serving her sentence upon the completion of William Salyers's sentence.

## II. Discussion

### A. Bruce

### 1. Indictment/Due Process Violation

Bruce first argues that the district court erred in denying his motion to dismiss the indictment because the underlying state laws are vague and therefore violate his due process rights. The government says that the state laws are clear and provide notice of what conduct is prohibited. This court reviews the district court's decision denying a motion to dismiss an indictment *de novo*. *United States v. Plavcak*, 411 F.3d 655, 659-60 (6th Cir. 2005).

Bruce does not dispute that the underlying state laws provide that no one may harvest mussels less than four inches in diameter. However, Bruce argues that as a consequence of events taking place after a mussel is taken from the water, a legally sized mussel may become illegal. Because of this, Bruce argues that the state laws do not provide fair notice. During the hearing on his motion to dismiss the indictment on these grounds, Bruce presented testimony from James Peach, who explained the mussel harvesting process in detail. The process begins when a mussel is removed from the water by a diver, like Bruce. A mussel is contained within a shell. The shell containing the mussel is passed though a metal ring, four inches in diameter. If the shell passes through the ring, it is too small and must be put back into the water. If the shell is larger than four inches, it may be removed from the water. After removal, the shell is placed on a truck for transport. Once the shells which contain the mussels arrive at the buyer's location, they are weighed and steamed. During steaming, the mussels and shell are separated. According to Peach, the harvesting and transport processes could result in shells becoming dehydrated, brittle, and easily broken. Peach further explained that because of these processes, there could be a change in the size of shells from the time they are initially harvested, *i.e.* the shells may become smaller.

One of the basic tenets of due process jurisprudence is that citizens are afforded fair notice of precisely what conduct is prohibited. *United States v. Baker*, 197 F.3d 211, 218-19 (6th Cir. 1999); *Lambert v. California*, 355 U.S. 225, 228 (1957). If a statute is "so technical or obscure that it threatens to ensnare individuals engaged in apparently innocent conduct," notice will not be presumed. *Baker*, 197 F.3d at 219.

Tennessee Wildlife Resources Commission Proclamation 99-6 and Alabama Wildlife and Freshwater Fisheries Regulation 220-2-.49 provide for the control of endangered, threatened, or in-

need of management mussel species and purport to restrict the number of waterways that are open to harvesting and the size and species of mussels that may be harvested. It is undisputed that mussels smaller than four inches cannot be harvested.

Notably, Bruce does not argue that the text of the regulations are vague, nor does he take issue with the four-inch prohibition. Rather, his argument is based on events which take place during the processing of mussels, after they have been removed from the water. He says that the state laws violate due process because a mussel shell which is larger than four inches when legally removed from the water, may later become smaller because of processing. Under these circumstances, Bruce says the state laws do not provide fair notice of what conduct is prohibited at the time of harvesting.

In this case, however, the shells were sized before they were processed. Trial testimony shows that the shells were sized while they were "green" and "fresh," and the shells "hadn't been cooked out yet." A special agent with the U.S. Fish and Wildlife Service testified that he did not "remember any [shells] being open." Another agent testified that he "told [his] guys [to] make sure there's a little daylight in between the ring [and the shell]. We don't want to take any chances of an accidental legal shell getting into our illegal inventory. So those shells that were close . . . were disregarded." The testimony at the pretrial hearing on the motion to dismiss confirms that agents processed the shells only "[a]fter they were measured," and that the shells "were measured green." Moreover, because the shells were still wet and green when they were measured, any natural deterioration and breakage would have been minimal. As applied to Bruce, then, the state laws provided fair notice that harvesting undersized mussels was prohibited conduct.

## 2. Evidentiary Issue

6

Bruce next argues that the district court erred in admitting two exhibits at trial because they were not properly authenticated and they were substantially more prejudicial than probative. We review a district court's evidentiary rulings for abuse of discretion. *United States v. Gibson*, 409 F.3d 325, 337 (6th Cir. 2005). "A district court abuses its discretion when it relies on clearly erroneous findings of fact, uses an incorrect legal standard, or applies the law incorrectly." *Kerobo v. Sw. Clean Fuels, Corp.*, 285 F.3d 531, 533 (6th Cir. 2002) (citations and internal quotation marks omitted). In reviewing a district court's Rule 403 determination, we must give "the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *United States v. Schrock*, 855 F.2d 327, 333 (6th Cir. 1988) (internal citations and quotation marks omitted).

The exhibits at issue, identified at trial as Exhibits 34 and 36, were Tennessee Wildlife Resources Agency ("TWRA") mussel receipts that were seized by U.S Fish and Wildlife agents during the execution of a search warrant on William Salyers's property. The receipts list Bruce as the seller and William Salyers as the buyer and contains their signatures. The government sought to introduce the receipts in conjunction with two other previously admitted exhibits, identified at trial as Exhibits 33 and 35. Exhibits 33 and 35 were weight tickets which showed mussels sold to William Salyers. The weight tickets were not dated. Charles Arnold testified that Exhibit 33 was a weight ticket he made out for Bruce for the mussels Bruce sold to William Salyers and that the notation "SLWB" on the ticket referred to washboard mussels less than four inches. Timmy Robbins identified Exhibit 35 as a weight ticket that he wrote and also testified that the notation on the ticket "SLWB" stood for "small lake washboards," which he explained were undersized shells. The government sought to introduce the mussel receipts to compare the weights listed on the receipts with the weights listed on the weight tickets to show that all weights were the same except for the

7

washboard mussels.

Bruce objected to the admission of Exhibits 34 and 36.[2] The district court considered the matter outside the presence of the jury. After hearing argument, the district court determined that the receipts were authentic and not substantially more prejudicial than probative.

As to authenticity, Fed. R. Evid. 901 provides in pertinent part:

Rule 901. Requirement of Authentication or Identification

(a) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.
(b) Illustrations. By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:
(1) Testimony of witness with knowledge. Testimony that a matter is what it is claimed to be.
(2) Nonexpert opinion on handwriting. Nonexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation.
(3) Comparison by trier or expert witness. Comparison by the trier of fact or by expert witnesses with specimens which have been authenticated.
(4) Distinctive characteristics and the like. Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.
. . .

"The key question under Federal Rule of Evidence 901 is whether 'the matter in question is what its proponent claims.'" *United States v. Damrah*, 412 F.3d 618, 628 (6th Cir. 2005)(quotation in original).

Here, U.S. Fish and Wildlife Agent Agent John Rayfield testified that under Tennessee law, TWRA receipts must be kept by the buyer for two years. Rayfield identified Exhibits 34 and 36 as TWRA receipts which were seized during a search of William Salyers's property. Rayfield's testimony establishes authenticity under Rule 901(b)(1). That is, the exhibits were what they were

---

[2]Pamela and William Salyers also objected to the admission of Exhibits 34 and 36, but do not challenge their admission in their appeals.

purported to be–TWRA mussel receipts. Thus, we find that the district court did not err in determining that Exhibits 34 and 36 were authentic.

As to whether the mussel receipts were more prejudicial than probative, *see Schrock*, 855 F.2d at 333, at trial Rayfield compared the weight tickets (Exhibits 33 and 35) with the mussel receipts (Exhibits 34 and 36) and noted that the mussel weights recorded were the same except for the lake washboard mussels. Charles Arnold and Timmy Robbins also compared the numbers listed on the weight tickets with the numbers on the receipts and testified that they were the same except for the lake washboards. Clearly, the receipts were probative in determining whether Bruce sold undersized mussels to the Salyerses. Bruce, however, says that the receipts were substantially more prejudicial than probative, arguing there were discrepancies in the weights and in Bruce's signature. These discrepancies do not make the receipts inadmissible. Rather, they simply provide an avenue to dispute whether the weight tickets and receipts did in fact correspond, a point that Bruce vigorously argued at trial. While the jury ultimately rejected Bruce's arguments, that does not mean the district court erred in admitting the receipts. Overall, we find that the district court did not abuse its discretion in admitting the mussel receipts.

### B. Pamela Salyers

### 1. Sufficiency of the Evidence

Pamela Salyers argues that the evidence did not establish that she had knowledge of the main purpose of the conspiracy or that she knowingly aided and abetted the conspiracy. We review sufficiency-of-evidence claims in the light most favorable to the government. If "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," then sufficient evidence exists. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[W]e do not weigh the

evidence, assess the credibility of the witnesses, or substitute our judgment for that of the jury."

*United States v. Wright*, 16 F.3d 1429, 1440 (6th Cir. 1994)(internal citation omitted).

> To establish a conspiracy, in violation of 18 U.S.C. § 371, the government must prove beyond a reasonable doubt that there was an agreement between two or more persons to act together in committing an offense, and an overt act in furtherance of the conspiracy. This requirement has been broken down into a four-part test, which requires the government to prove that: 1) the conspiracy described in the indictment was wilfully [sic] formed, and was existing at or about the time alleged; 2) the accused willfully [sic] became a member of the conspiracy; 3) one of the conspirators thereafter knowingly committed at least one overt act charged in the indictment at or about the time and place alleged; and 4) that overt act was knowingly done in furtherance of some object or purpose of the conspiracy as charged.

*United States v. Beverly*, 369 F.3d 516, 532 (6th Cir. 2004)(internal citations and quotations omitted).

Pamela Salyers argues that the evidence at trial at best showed she played a minor role in her husband's business and her limited time spent in the office was not sufficient to establish a role in the conspiracy. In other words, she argues that there was insufficient evidence presented that she knew the purpose of the conspiracy, that she voluntarily joined the conspiracy, or that she aided and abetted the same. In order to resolve this issue, a review of the evidence presented at trial is in order.

The government presented proof through the testimony of Michael Bloxom, enforcement supervisor for the Wildlife Freshwater Fisheries Division for the Alabama Department of Conservation and Natural Resources. He testified that during the time of the conspiracy, the minimum size for harvesting and selling lake washboard mussels in Alabama was four inches. Similarly, Freddie Couch, the statewide commercial enforcement officer for TWRA testified that the size limit in Tennessee was four inches. Pamela Salyers suggests that the state laws regarding the size of mussels are problematic, citing the testimony of Peach. However, it is undisputed that

10

the size requirements are clearly laid out in the text of the law. Moreover, as explained in detail below, the government produced sufficient evidence that Pamela Salyers was aware that she and her husband were purchasing undersized shells.

James Wilson, a mussel diver, testified that he began selling undersized shells in 2003 to William Salyers, and continued to do so for about seven or eight months when he was cited for the undersized shells. He further testified that when he brought the mussels in, they were weighed by the workers, marked on a ticket, and tallied, after which he was given a receipt by Pamela Salyers or her husband. Wilson also testified that William Salyers specifically asked him to bring in small mussel shells and that those small shells were not recorded on the TWRA receipt.

Larry Baker testified that he also sold small washboard mussels to William Salyers. His testimony was generally consistent with that of Wilson. He testified that Pamela Salyers worked at the business. He admitted to selling approximately 2,300 pounds of illegal shells to the Salyerses.

Robert Siedler, an enforcement officer with the Alabama Department of Conservation and Natural Resources operating undercover, also testified at trial. He testified that he went to the Salyerses' place of business to see if they would buy undersized shells. He further testified he sold the Salyerses legal and illegal shells and that all of his contact with the Salyerses was audio-or video-taped. He also testified that he received two TWRA receipts for legal shells from Pamela Salyers that she filled out.

Siedler further testified that on August 25, 2004, he went to the Salyerses's business to sell them legal and illegal shells. The audiotape was played for the jury. Siedler identified Pamela Salyers's voice on the tape and stated that he received two checks from her, one from Bruce Metts for the legal shells and one from him for the illegal shells. He also identified the check Pamela

11

Salyers gave him for the 405 pounds of illegal shells. On the audio tape, while William Salyers is making out checks, he asks Pamela Salyers whether the "four hundred of them small boards" are on the ticket, to which she replies that they are not. The remainder of the conversation was played, which Siedler explained showed Pamela Salyers had intimate knowledge of the mussel business. Siedler further testified that he sold 2,444 pounds of illegal shells to the Salyerses on August 28, 2004 and another 1,267 pounds on October 19, 2004. Pamela Salyers was present at both transactions. Finally, Siedler testified that during these transactions, he explained to Pamela Salyers that the shells were undersized and he did not want any paperwork. He was never given a receipt for the illegal shells. Most of the time, Pamela Salyers filled out the checks.

Charles Arnold testified that he worked for the Salyerses weighing and grading shells and filling out the weight tickets. He explained that a weigh ticket which had the notation "SWLB" on it referred to small lake washboards and meant mussel shells that were less than four inches. He further testified that tickets with this notation would be handed in to the office to either Pamela Salyers or William Salyers.

Timmy Robbins testified that he made up weight tickets and gave them to Pamela Salyers or sometimes gave them to the divers. He also explained that "SWLB" stood for small lake washboards, meaning undersized shells. He further testified that the small shells would be separated from the regular shells. He identified the handwriting on Exhibit 35, the weigh ticket he made out, which contained "SWLB," as Pamela Salyers's handwriting.

Based on the above, ample proof was presented at trial that small shells were sold to Pamela Salyers and her husband and that the shells were weighed and the weights were written on a weight ticket. If there were small lake washboard mussels on the ticket, they were marked with the notation

12

"SWLB," to indicate they were small, *i.e.*, illegally undersized. The weight tickets were given to Pamela Salyers or William Salyers and tallied up, and the divers were given a TWRA receipt. If small lake washboard mussels were sold, they were never shown on the TWRA receipt.

The evidence also showed that Pamela Salyers or her husband were buying illegally small shells. Pamela or William Salyers would use the weight tickets to make out the TWRA receipts. Two of the weight tickets were compared to the TWRA receipts which indicted that the TWRA receipts did not reflect the small lake washboards listed on the weight ticket. Pamela Salyers's handwriting was identified on exhibit 35, the weight ticket, by Robbins.

Siedler's testimony also established Pamela Salyers's knowledge and role in the conspiracy. Seidler explained that he told Pamela Salyers that the shells were undersized and that he did not want any paperwork. He was never given a mussel receipt for any of the illegal shells. However, Pamela Salyers did give him mussel receipts for the legal shells. The recordings played in connection with Siedler's testimony further evidenced her role in the conspiracy.

Based on a review of the trial record, we find that there was sufficient evidence to show that Pamela Salyers had a role in the conspiracy, beyond that of a bookkeeper allegedly unaware of any criminal activity. The testimony showed that Pamela Salyers paid the divers separate amounts of money depending on whether they brought legally sized or illegally undersized mussel shells. She prepared shipping documentation which both concealed and revealed the legally sized and illegally undersized mussel shells, respectively, that were being shipped from the business. Based on all of the evidence, we are satisfied that Pamela Salyers was a knowing participant in the conspiracy.

**2. Sentence**

Pamela Salyers also argues that her 12 month and 1 day sentence is procedurally and

13

substantively unreasonable. "'Post-*Booker*, we review a district court's sentencing determination under a deferential abuse-of-discretion standard, for reasonableness,'" *United States v. Presley*, 547 F.3d 625, 629 (6th Cir. 2008) (quoting *United States v. Bolds*, 511 F.3d 568, 578 (6th Cir. 2007)), and the inquiry is "limited to determining whether [a sentence is] reasonable." *Gall v. United States*, 552 U.S. 38, 46 (2007)(internal citations and quotations omitted). We must

> first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence-including an explanation for any deviation from the Guidelines range.

*Id*. at 51. If there is no significant procedural error, we then "consider the substantive reasonableness," giving "due deference" to the district court's consideration of the § 3553(a) factors. *Id*.

Pamela Salyers first says her sentence is procedurally unreasonable because the district court limited her variance arguments to her being a care giver to her grandchildren and failing to consider her cooperation–which led to the controlled delivery of shells to Shin and persuading her husband to plead guilty. She presented her arguments regarding cooperation in her response to the presentence investigation report and again at sentencing. However, after her sentence was pronounced, she did not object on this basis when questioned by the district court. Thus, her arguments are subject to plain-error review. *See United States v. Harmon*, 607 F.3d 233, 237 (6th Cir. 2010). To establish plain error, a defendant must show (1) that an error occurred in the district court; (2) that the error was plain, i.e., obvious or clear; (3) that the error affected defendant's substantial rights; and (4) that this error seriously affected the fairness, integrity or public reputation of the judicial proceedings. *Johnson v. United States*, 520 U.S. 461, 466-67 (1997); *United States*

14

*v. Thomas*, 11 F.3d 620, 629-30 (6th Cir. 1993) (discussing at length the plain error doctrine set forth in *United States v. Olano*, 507 U.S. 725 (1993)).

As the government notes, Pamela Salyers points to no evidence in the record to support her contentions regarding her cooperation. There was no testimony offered on these points, nor was any other proof offered in this regard. In seeking a lower sentence, she bore the burden of showing some evidence of her cooperation efforts. *See United States v. Rodriguez*, 896 F.2d 1031, 1033 (6th Cir. 1990). She did not. In the absence of a factual basis, it cannot be said that the district court procedurally erred in fashioning her sentence without regard to her alleged cooperation.

Finally, Pamela Salyers argues that her sentence is substantively unreasonable because the district court failed to properly consider the § 3553(a) factors. Again, she bases this argument on her alleged cooperation efforts. This argument fails for the same reasons her procedural argument fails–a lack of a factual basis for her assertions. A review of the sentencing transcript shows the district court acknowledged the advisory nature of the Guidelines, considered the § 3553(a) factors, correctly calculated the Guidelines range, and fashioned a sentence well below the range based on application of the § 3553(a) factors. Nothing in the record suggests that the district court abused its discretion in imposing her sentence.

### C. William Salyers

### 1. Restitution

William Salyers first argues that the district court erred in ordering restitution because there is no identifiable victim and restitution is otherwise inappropriate. He also challenges the methodology used by the district court for determining the amount of restitution. Following a request for briefing on the issue of restitution, the district court ordered $50,000.00 in restitution to

15

the Tennessee Wildlife Resources Agency and the Alabama Department of Conservation and Natural Resources, with $45,000.00 going to the Tennessee agency and $5,000.00 to the Alabama agency. The restitution was ordered joint and several with Pamela Salyers and Tunguyan Shin.

William Salyers did not raise either argument regarding restitution before the district court. While the government says William Salyers has waived any issues regarding restitution, that is not the case. Rather, when a defendant fails to object to an order of restitution, a subsequent challenge to the order is reviewable, but only for plain error. *United States v. Schulte*, 264 F.3d 656, 660 (6th Cir. 2001); *United States v. Hall*, 71 F.3d 569, 573 (6th Cir. 1995) ("The Sixth Circuit has held that where no objection is made to the order of restitution at sentencing, the appellate court reviews for plain error.")(internal citation omitted).

By way of background, in April 1996, Congress passed the Antiterrorism and Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. The AEDPA included the Mandatory Victims Restitution Act of 1996 ("MVRA"), which amended the Victim Witness Protection Act of 1982. The MVRA added section 3663A, which requires mandatory restitution[3] to victims of certain crimes, including offenses against property under Title 18 and including any offense committed by fraud or deceit. For the covered offenses under § 3663A, a district court "shall order" full restitution, which must be imposed "without consideration of the economic circumstances of the defendant." 18 U.S.C. §§ 3663A(a)(1), 3664(f)(1)(A).

William Salyers argues that restitution is not appropriate because the state agencies involved, the TWRA and the Alabama Department of Conservation and Natural Resources, cannot be

---

[3]In the legislative history of the MVRA, the Senate Committee stated quite clearly: "It is the committee's intent that courts order full restitution to all identifiable victims of covered offenses." Sen. Rep. No. 179, 104th Cong., 2d Sess., reprinted in 1996 U.S.C.C.A.N. 924, 931.

considered "victims" for purposes of restitution. He is mistaken. In *Ratliff v. United States*, 999

F.2d 1023, 1027 (6th Cir. 1993), a panel of this court stated:

> The sentencing court's order of restitution to the Department of Labor was not error because
> the government can be a "victim" under the VWPA. *See e.g., United States v. Streebing*, 987
> F.2d 368 (6th Cir. 1993) (Social Security Administration); *United States v. Smith*, 944 F.2d
> 618 (9th Cir. 1991), *cert. denied* [503 U.S. 951], 117 L.Ed.2d 651, 112 S.Ct. 1515 (1992)
> (Federal Savings and Loan Insurance Corporation); *United States v. Helmsley*, 941 F.2d 71
> (2d Cir.1991), *cert. denied* [502 U.S. 1091], 117 L.Ed.2d 409, 112 S.Ct. 1162,(1992)
> (Internal Revenue Service).

Like the federal agencies listed above, the state agencies involved in this case can be considered

victims entitled to restitution. The undersized mussels were taken from Tennessee and Alabama

waters in violation of a regulatory scheme. They were not the property of the possessors, but rather

the states from whose waters they were taken. Thus, the states have a property interest in the mussel

shells and are entitled to compensation for their loss. Notably, restitution was not awarded for

investigation or prosecution costs, which is prohibited. *See Gall v. United States*, 21 F.3d 107, 112

(6th Cir. 1994) ("[I]nvestigative costs are not losses, but voluntary expenditures by the government

for the procurement of evidence. . . . [W]here . . . a restitution award is based solely on the costs of

the government's investigation and prosecution of the defendant, it is not a direct loss resulting from

defendant's illegal conduct for which restitution may be awarded pursuant to the VWPA."); *Ratliff*,

999 F.2d at 1026 (finding that "restitution may not be awarded under the VWPA for investigation

or prosecution costs incurred in the offense of conviction").

With respect to the amount of restitution, William Salyers argues that the district court should

have looked to U.S.S.G. § 5E1.1(d), which provides that, for drug offenses, the amount of restitution

should not exceed the fine imposed under § 5E1.2. This argument does not advance his cause. As

noted in the Presentence Investigation Report ("PSR"), he faced a statutory fine of $250,000.00 and

17

a guidelines fine of $6,000.00 to $60,000.00  PSR ¶ 66, 67.  The amount of restitution ordered was within the guidelines range and therefore presumed reasonable.

William Salyers also cites the civil and criminal penalties provisions for Lacey Act violations under 16 U.S.C. §§ 3372(a)(1), 3372(d)(2).  However, as the government notes, William Salyers pled guilty to five counts, resulting in a possibility of $50,000.00 in civil penalties and $50,000.00 in criminal fines, precisely the amount of restitution.  Moreover, the district court made a factual determination at sentencing that the value of the illegally harvested mussels was $85,120.00, a finding William Salyers does not challenge.  Not only was there a basis for ordering restitution, but also for the amount of the restitution.  Overall, we find that the district court did not commit plain error in ordering restitution to the state agencies in the amount of $50,000.00.

## 2.  Sentence

William Salyers argues that his sentence is unreasonable because of a disparity with his co-defendants and that the district court erred in failing to grant him a downward departure or variance based on his medical condition.  As noted above, we review his sentence for reasonableness under an abuse-of-discretion standard.  *See Presley*, 547 F.3d at 629.

Here, William Salyers does not argue the district court was unaware of its authority, nor does the record reveal otherwise.  Indeed, the fact that the district court imposed a sentence below the advisory guidelines range demonstrates its awareness of its discretion to vary from the guidelines.  To the extent William Salyers sees error in the refusal of the district court to vary based on his medical condition, he is essentially arguing that his sentence is too long to accomplish the purposes set forth in § 3553(a), which is a substantive reasonableness complaint.

"The essence of a substantive-reasonableness claim is whether the length of the sentence is

18

'greater than necessary' to achieve the sentencing goals set forth in 18 U.S.C. § 3553(a)." *United States v. Tristan-Madrigal*, 601 F.3d 629, 632-33 (6th Cir. 2010) (quoting *Gall*, 552 U.S. at 51). "'A sentence is substantively unreasonable if the district court selects the sentence arbitrarily, bases the sentence on impermissible factors, fails to consider pertinent § 3553(a) factors or gives an unreasonable amount of weight to any pertinent factor.'" *Id*. at 633 (quoting *United States v. Walls*, 546 F.3d 728, 736 (6th Cir. 2008)).

Here, the district court was well aware of William Salyers's medical needs. The district court held a hearing prior to sentencing specific to his medical condition and found that the Bureau of Prisons could meet his medical needs. Moreover, a nurse practitioner testified at his sentencing, further detailing his conditions, which included sleep apnea, hypertension, elevated cholesterol, diabetes, and coronary artery disease, for which he was on several prescribed medications. In taking this into consideration, the district court recommended that William Salyers be housed at a medical facility. Based on the record, his sentence was not substantively unreasonable. Moreover, the district court clearly stated and considered the § 3553(a) factors before imposing the 20-month sentence.

Regarding disparity, William Salyers argues that because many of his co-defendants received non-custodial sentences after pleading guilty, his custodial sentence is unreasonable. Putting aside that he did not raise the issue at sentencing, his argument lacks merit. Disparity in sentencing refers to national disparity, not disparity between co-defendants. As we have stated:

> Although 18 U.S.C. § 3553(a)(6) requires that the sentencing court consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," this factor "concerns *national* disparities between defendants with similar criminal histories convicted of similar conduct-not disparities between codefendants." *United States v. Conatser*, 514 F.3d 508, 521 (6th Cir. 2008), *cert.*

19

*denied, Marlowe v. United States*, 129 S.Ct. 450, 172 L.Ed.2d 320 (2008). "Disparities between the sentences of coconspirators can exist for valid reasons, such as differences in criminal histories, the offenses of conviction, or one co-conspirator's decision to plead guilty and cooperate with the government." *Id*. at 522. Tait does not argue that his within-Guidelines sentence is disparate from those received by similarly-situated offenders at the national level, and his extensive criminal history amply justifies any discrepancy between his sentence and his coconspirators.'

*United States v. Tait*, 337 F. App'x, 498, 499-500 (6th Cir. 2009).

Similarly, William Salyers does not argue that his sentence is disparate on a national level. Moreover, while his co-defendants received lesser sentences, William Salyers's role in the conspiracy and the circumstances of his plea were decidedly different. He compares himself to Tungyuan Shin, who also purchased illegal shells. This comparison is not convincing. Unlike Shin, William Salyers employed five others at his business and purchased illegal shells from at least six divers. His level of cooperation was also different. While he initially cooperated and arranged for a buy with Tungyuan Shin, he refused to identify his divers. He went to trial. He pleaded guilty only after his wife and Bruce were convicted at trial. His co-defendants, including Tungyuan Shin, pleaded guilty and many testified at trial. A review of the sentencing transcript shows that the district court considered the roles of all defendants and their levels of cooperation and concluded, rightly so, that William Salyers was not entitled to the same treatment.

In sum, William Salyers has failed to show that the district court abused its discretion in imposing his sentence, or that his sentence was unreasonable.

### III. Conclusion

For the reasons stated above, defendants' convictions and sentences are AFFIRMED.